Hersey HAWKINS, Gregory Jones, Wilbon Perry, Jerry Thomas, Paul Wilson, Anthony Manual, and Lawrence Y. O'Reilly, Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, Defendant.

No. 86–1246.

United States District Court, C.D. Illinois, Peoria Division.

Jan. 30, 1987.

James M. Rochford and Kevin Sommer, Peoria, Ill., for plaintiffs.

Janet L. Jannusch, Peoria, Ill., George Gangwere, Jr., Kansas City, Mo., for defendant.

## ORDER

MIHM, District Judge.

Presently before this Court is Defendant's Motion to Dismiss, or in the alternative for Summary Judgment pursuant to Federal Rules of Civil Procedure 12 and 56. Section 12(b)(6) provides:

"(I)f, on a motion asserting the defense number (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...."

In the present case, the Court treated Defendant's 12(b)(6) motion to dismiss as a motion for summary judgment (hereinafter referred to as Defendant's Motion for Sum-

mary Judgment). Notice was given to all parties that the Court would consider it as such, and on January 5, 1987, a hearing was held at which time all parties were given a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56," as required by Federal Rule of Civil Procedure 12(b).

On June 26, 1986 the NCAA Committee on Infractions issued its Confidential Report No. 222 (146), which found that Bradley University had violated NCAA regulations. The report detailed the results of the NCAA's extensive investigation of Bradley's basketball program. As set forth in the Committee's Confidential Report No. 222 (146), its investigation led to the Committee's conclusion that Bradley had violated ten of the NCAA's regulations. The sanctions imposed, pursuant to the NCAA rules, were public reprimand, two year probation period, and Bradley's intercollegiate mens' basketball team was barred from participation in the NCAA's Division 1 mens' basketball championship or any post-season competition during the 1986–87 academic year. Lastly, the mens' basketball team's coaching staff was prohibited from participation in off campus recruiting activities for a one year period.

Bradley was notified of its right to appeal any findings and/or penalties imposed by the NCAA council. On June 30, 1983, Bradley University advised the NCAA that it had decided not to appeal either the findings of violation or penalty. Head basketball coach Versace also elected not to exercise his right of appeal, and so informed the NCAA.

On September 3, 1986, Plaintiffs filed their complaint against the NCAA. The Plaintiffs are all currently enrolled students at Bradley University, who are "members of, managers of, or otherwise affiliated with the University's mens' basketball team." The complaint sets forth four claims.

Counts I and II are brought before this Court pursuant to federal question jurisdiction, 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitu-

tion. Counts III and IV are brought as pendent state claims.

Count I seeks injunction against the NCAA, prohibiting it from enforcing the disciplinary action taken against Bradley University, including attorneys' fees and costs. Plaintiffs assert that the imposition of the NCAA sanctions, which prohibits Bradley University's mens' basketball team from engaging in post-season basketball competition during the 1986–87 academic year, without giving Plaintiffs an opportunity to be heard, denied the Plaintiffs procedural due process of law in violation of the United States Constitution.

Count II of Plaintiffs' complaint alleges a violation of equal protection guaratees of the Fourteenth Amendment. Plaintiffs allege that as a direct result of the NCAA's action the Plaintiffs' fundamental rights to prepare for and pursue the vocation of their choosing and be free of punishment absent personal guilt were violated.

Count III alleges tortious interference with a contractual relationship. Plaintiff asserts that the NCAA's actions induced Bradley to breach its scholarship agreement with the Plaintiffs, which allegedly "guaranteed" Plaintiffs' opportunity to compete in post-season basketball tournaments.

Count IV sets forth a claim based upon laches. Plaintiffs allege that the Defendant is guilty of laches in bringing charges of NCAA violations against Bradley University, and that Plaintiffs were erroneously precluded from asserting the equitable doctrine of laches on behalf of Bradley University during the hearing before the Commission on Infractions.

STATE ACTION

As previously noted, the claims presented in this case are brought before the Court pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution. The Fourteenth Amendment of the Constitution provides in part that: "No state shall ... deprive any person of life, liberty, or property without due process of law." Since the United

States Supreme Court's decision in the Civil Rights Cases, 109 U.S. 3 (1883):

"This principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the state. *Shelly v. Kraemer*, 334 U.S. 1, 13 [68 S.Ct 836, 842, 92 L.Ed. 1161] (1948)."

It is well settled that the Fourteenth Amendment "erects no shield against merely private conduct however discriminatory or wrongful." *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982).

Similarly, 42 U.S.C. § 1983 provides:

"If a person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

As is clear from a reading of these sections of the Fourteenth Amendment and § 1983, claims brought pursuant to either raises the question of state action. Although two distinct lines of cases have developed as a result, the United States Supreme Court has spoken as to the relationship between them. In *United States v. Price*, 383 U.S. 787 n. 7, 86 S.Ct. 1152 n. 7, 16 L.Ed.2d 267 (1966), the Court stated:

"In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' requirement under the Fourteenth Amendment."

*United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966).

Thus, "the principle derived from both lines of cases are used interchangeably." *Howard University v. NCAA*, 510 F.2d 213, 217 n. 4 (D.C.Cir.1975). Therefore, this Court in its discussion of state action will not distinguish between the § 1983 and Fourteenth Amendment cases, as approved by the United States Supreme Court.

■ Critical to Plaintiffs' Due Process and Equal Protection claims is the issue of whether the NCAA's actions constitute state action. Both claims require a primary finding that the actions complained of constituted state action. Where the court findings that no such state action existed, both the due process and equal protection claims must fall.

■ As will be discussed, this Court finds that the acts of the NCAA did not constitute state action. Consequently, Plaintiffs' claims of a due process and equal protection violation cannot be sustained. As to Counts I and II of Plaintiffs' complaint, the Court holds in favor of the Defendant and GRANTS the Defendant's Motion for Summary Judgment.

The case law regarding what constitutes state action has developed in two clearly distinct segments. The first segment involved a series of actions brought against the NCAA, which found the existence of state action in light of an entanglement theory analysis. See *Howard University v. NCAA*, 510 F.2d 213 (D.C.Cir.1975); *Parish v. NCAA*, 506 F.2d 1028 (5th Cir.1975); *Associated Students, Inc. v. NCAA*, 493 F.2d 1251 (9th Cir.1974); *Buckton v. NCAA*, 366 F.Supp. 1152, 1155–57 (D.Mass. 1973); *Jones v. NCAA*, 392 F.Supp. 295 (D.Mass.1975).

Pursuant to an entanglement theory analysis, state action will be found where "(c)onduct that is formally 'private' becomes so intertwined with governmental policies or so impregnated with government character that the conduct becomes subject to the constitutional limitations placed upon state action." *Howard University v. NCAA*, 510 F.2d 213, 217 (D.C. Cir.1975). In applying this analysis, the courts have found that the courts must address each case on a case by case basis, being careful to sift through the facts and weigh the circumstances. *Id.* The entanglement theory provides that the govern-

ment's involvement need not be either exclusive or direct; rather, government action may be found even though the government's participation was "peripheral, or its action was only one of several cooperative forces leading to the constitutional violation." *Id.*

The line of cases that adopt the entanglement theory analysis are founded upon an even earlier line of cases, hereafter referred to as the high school athletic program cases. See *Louisiana High School Athletic Association v. St. Augustine High School,* 396 F.2d 224 (5th Cir.1968); *Wright v. Arkansas Activities Association,* 501 F.2d 25 (8th Cir.1974); *Mitchell v. Louisiana High School Athletic Association,* 430 F.2d 1155 (5th Cir.1970). The high school athletic program cases involved the affairs of ostensibly private organizations in several states, which regulated high school athletic programs and other extra curricular activities. Consistently, the regulatory acts of these associations were found to constitute state action.

In all of these cases, the courts recognized the private nature of the organizations, and the fact that they were voluntary associations. However, the focuse of these courts was on the following facts: (1) membership of these associations consisted substantially of public high schools, which provided personnel, facilities, and financial support; (2) the organization's rules were promulgated by the vote of members, including public schools; and (3) these private organizations significantly regulated and effected the program of these public entities, including state championship events, imposing restrictions on practices and eligibility, conducting investigations, and imposing sanctions. These courts concluded that the organizations were sufficiently intertwined with state instrumentalities, whose involvement was significant, although not exclusive, as to be subject to constitutional restraints. *Howard University v. NCAA,* 510 F.2d 213, 218 (D.C.Cir. 1975).

The second segment in the development of state action cases arose subsequent to the high school athletic program cases. In 1982, the United States Supreme Court decided *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) and *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), in which it rejected the high school athletic program state action analysis and adopted a new three part test.

The issue before the Court in *Blum* was whether the actions of certain nursing homes constituted state action. The Court was confronted with deciding whether decisions regarding transfers of patients could be fairly attributed to the state, and hence be subjected to Fourteenth Amendment due process requirements. The transfers primarily involved decisions made by physicians and nursing home administrators to move patients from "skilled nursing facilities" to less expensive "health-related facilities." *Blum v. Yaretsky,* 457 U.S. at 1005, 102 S.Ct. at 2786. The nursing homes involved were privately owned and operated. *Id.* at 1003, 102 S.Ct. at 2785.

In deciding the question whether state action existed, the court set out a three factor analysis: (1) to what extent the business is subjected to state regulations. However, the court asserted that the mere fact that a business is subject to state regulations does not by itself convert its actions into that of the state for purposes of the Fourteenth Amendment; (2) The sufficiency of a close nexus between the state and the challenged action of the regulatory entity, so that the action of the entity may be fairly treated as that of the state itself; (3) Whether the private decision involves such coercive power or significant encouragement, either overt or covert, by the state that the choice must in law be deemed to be that of the state. *Blum v. Yaretsky,* 457 U.S. at 1004, 102 S.Ct. at 2785. The Court went on to note that the required nexus may be present if the private entity has exercised powers that are "traditionally the exclusive prerogative of the state." *Id.*

The court held that the transfer decisions were not actions of the state, since the

nursing home's transfer decision did not involve "coercive power or significant encouragement, overt or covert," by the state. *Blum v. Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2786. Thus, the transfer decision in law could not be deemed to be that of the state.

In *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the court found no state action based on the *Blum* analysis. As in *Blum*, the *Rendell* court rejected the "symbiotic relationship" argument set forth by the plaintiff.

The issue before the Court in *Rendell* was whether a private high school's discharge of employees constituted state action for the purposes of the First and Fourteenth Amendment. The private school received funding from the state, which required compliance with a variety of state regulations, few of which related to personnel issues. The plaintiffs claimed that their discharge from a private school receiving such funding from the state constituted state action.

The Court held that neither a private school's receipt of public funds, nor significant or even total engagement in performing public school contracts for the benefit of the government rendered the employees' discharge decision acts of the state. The Court reiterated that the function performed must have traditionally been the exclusive prerogative of the state, and noted that the school's relationship with the state was no different than that of any contractor's performing services for the government. *Rendell-Baker v. Kohn*, 457 U.S. at 843, 102 S.Ct. at 2772.

Following the rationale of the "second segment" state action cases, several courts have recently held that the actions of the NCAA cannot be said to constitute "state action." See *Arlosoroff v. NCAA*, 746 F.2d 1019 (4th Cir.1984); *McHale v. Cornell University*, 620 F.Supp. 67 (D.C.N.Y. 1985). In *Arlosoroff v. NCAA*, 746 F.2d 1019 (4th Cir.1984), the court asserted:

"These earlier cases rested upon the notion that indirect involvement of state governments could convert what otherwise would be considered private conduct into state action. That notion has now been rejected by the Supreme Court, however, and its decisions require a different conclusion." (Citations omitted). *Arlosoroff v. NCAA*, 746 F.2d at 1021. Although the NCAA may perform a public function in overseeing the nation's intercollegiate athletics, it remains a private institution. *McHale v. Cornell University*, 620 F.Supp. at 70. See *Graham v. NCAA*, 804 F.2d 953 (6th Cir.1986).

It is not disputed that the NCAA is a voluntary, unincorporated association of nearly 1,000 four year colleges and universities. Approximately one-half of its members are public institutions, and these institutions provide more than one-half of the NCAA's revenues. *Arlosoroff v. NCAA*, 746 F.2d at 1021.

The NCAA implements its governing function through annual conventions, of which all member institutions are represented. It is through these conventions that it promulgates rules to ensure minimum standards for scholarship, sportsmanship, and amateurism. Most actions by the NCAA require a two-third vote for passage.

All participating institutions are required to abide by the rules promulgated by the convention, and an elected committee has power to enforce those rules. The imposition of sanctions is provided for where an institution or its players are found to be in violation of the rules.

As was discussed in the cases of *Arlosoroff*, *McHale*, and *Graham*, the nature of the NCAA and its governing function does not satisfy the three factor state action analysis set forth in *Blum* and followed in *Rendell*. The NCAA is not an agency which is subjected to or governed by any state government. It is governed by its own conventions and designated committees, which are established through election by member institutions. The two-third vote provision carefully avoids public institution collusion, if such action be contemplated. This minimizes, if not eliminates,

the extent to which the NCAA could be subject to state regulation.

While it is undisputed that the NCAA does consist of numerous public institutions, which supply at least one-half of the financial support to the association, such membership or funding, even if it were 100%, is insufficient to render the NCAA's conduct state action. *Rendell-Baker v. Kohn*, 457 U.S. at 840, 102 S.Ct. at 2770. These facts do not alter the basic character of the NCAA as a voluntary association of public and private institutions. *Arlosoroff*, 746 F.2d at 1021. As noted in *Arlosoroff*:

> "It is not enough that an institution is highly regulated and subsidized by a state. If the state in its regulatory or subsidizing function did not order or cause the action complained ... there is no state action."

*Arlosoroff v. NCAA*, 746 F.2d at 1021. See also, *McHale v. Cornell University*, 620 F.Supp. 67 (D.C.N.Y.1985).

Even though the required nexus may be established if the private entity has exercised powers that are "traditionally the exclusive prerequisite of the state," the NCAA's conduct still cannot be deemed to possess the requisite nexus. For despite the NCAA's regulatory or overseeing function, regarding the nation's intercollegiate athletics, such regulation of intercollegiate sports cannot fairly be said to be traditionally an exclusive state function. *McHale v. Cornell University*, 620 F.Supp. at 70. Certainly, if providing education to our nation's children is not an exclusive state function, neither can regulating inter-collegiate sports be an *exclusive* state function.

This Court does not suggest that through public institution membership certain states do not have some involvement in NCAA decisions. Of course, they do. However, what this Court concludes is that such input does not rise to the level of "exercising coercive power or significant encouragement" so that the decision must be deemed to be that of the state itself. Of particular significance is the NCAA rule calling for a two-third vote on most matters, and that there is no evidence in the record that the NCAA has ever been used by any state as a tool to carry out any state policy.

Adopting the second segment state action cases, led by the United States Supreme Court decisions in *Blum* and *Rendell*, this Court finds that the NCAA's actions in imposing sanctions against Bradley University do not constitute state action. Therefore, this Court grants the Defendant's Motion for Summary Judgment as to Plaintiffs' due process and equal protection claims, Counts I and II, respectively.

## PROCEDURAL DUE PROCESS

As noted at the onset of the state action discussion, if the Plaintiffs cannot establish that the NCAA's acts constitute state action, both their due process and equal protection claims must fail. In light of this Court's holding that there is no state action in this case, there need not be any further discussion of Plaintiffs' due process or equal protection claims. However, this Court deems it appropriate to address a few key points.

■ Redress pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment may be granted upon a showing of infringement of a property or liberty interest protected under the Fourteenth Amendment. The Plaintiffs have conceded that there is no "liberty" interest at stake in the present case. Therefore, the Plaintiffs' burden is to demonstrate that they were deprived of a property interest. *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 82, 98 S.Ct. 948, 951, 55 L.Ed.2d 124 (1978).

In the present case, Plaintiffs assert that the NCAA's failure to permit Plaintiffs a hearing regarding the imposition of sanctions on Bradley University deprived them of the procedural due process, to which they are entitled. Plaintiffs allege that the property rights infringed upon include: (1) the right to participate in post-season basketball competition; (2) the right to have the opportunity to gain tournament experience; and (3) the right to secure professional careers in athletics.

■ In its most basic form, a procedural due process analysis requires the Court to ask three questions: (1) whether the defendant's acts constitute state action; (2) whether plaintiff has a protectable interest, defined as a deprivation of "life, liberty, or property;" and, if the answer to both of the above questions is "yes," the Court must address (3) what due process is required by the Constitution. Assuming, arguendo, that this Court found state action in the present case, it must then turn to the second step of the analysis.

■ Plaintiffs' contentions that they have a constitutionally protected right to participate in intercollegiate athletic post-season competition, gain tournament experience, and secure professional careers in athletics have all been held not to be constitutionally protected "interests" for the purpose of due process. This Court concurs with those holdings.

First, the Plaintiffs allege that they possess a constitutionally protected property interest in participation in intercollegiate athletic post-season competition. The United States Supreme Court in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) addressed the issue of the parameters of a constitutionally protected property interest.

> "Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person cleary must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."

*Board of Regents v. Roth*, 408 U.S. at 576–77, 92 S.Ct. at 2709. Pursuant to these parameters, it has been held that there is no property or liberty interest in participating in interscholastic athletics. *Hamilton v. Tennessee Secondary School Athletic Association*, 552 F.2d 681 (6th Cir.1976); *Mitchell v. Louisiana High School Athletic Association*, 430 F.2d 1155 (5th Cir.1970); *Rutledge v. Arizona Board of Regents*, 660 F.2d 1345 (9th Cir.1981), *aff'd on other grounds*, 460 U.S. 719, 103

S.Ct. 1483, 75 L.Ed.2d 413 (1983). Despite this holding, the Plaintiffs in this case go one step further in their allegations, and allege a more remote claim, that the NCAA action has deprived them of the opportunity to play in post-season tournaments.

In *Parish v. NCAA*, 361 F.Supp. 1220 (W.D.La.1973), the court addressed a very similar claim to that of the Plaintiffs in the present case. In *Parish* the court concluded that the interests alleged were insufficient to rise to the level of procedural due process protection, and stated:

> "(T)he privilege of participating in interscholastic athletics must be deemed to fall ... outside the protection of due process. (Citation omitted). In this case, however, we need not go that far. For appellants here have lost only the opportunity to play in NCAA sponsored tournaments and televised games. Whatever the status of the alleged right to participate in interscholastic athletics, in the present circumstances we discern no 'property' or 'liberty' interest of which appellants have been deprived...."

*Parish v. NCAA*, 506 F.2d 1028, 1034 (5th Cir.1975). The Court held that plaintiffs had no constitutionally protected right to play in post-season competition. This Court concurs with the position that there is no constitutionally protected property interest in participation in post-season competition.

As in *Parish*, the Plaintiffs in the present case allege a constitutionally protected right in gaining tournament experience, which includes the national exposure and the associated business contacts. The court in *Parish* stated:

> "Appellants wisely abandoned at oral argument their ability to create a property interest out of the alleged injury to their hoped-for careers in professional basketball from their inability to gain tournament experience and television exposure. Both the injury and the career are far too speculative to establish a property interest as defined in *Roth*."

*Parish v. NCAA*, 506 F.2d at 1034 n. 17. This Court concurs with the position that there is no constitutionally protected prop-

erty interest in gaining tournament experience or media exposure.

Thirdly, Plaintiffs contention that they have a constitutionally protected right to secure professional careers in athletics similarly fails. As noted by the Court in *Parish,* when addressing the alleged deprivation of "hoped-for careers in professional basketball," which resulted from inability to gain tournament experience and television exposure, the Court stated: "both the injury and the career are far to speculative to establish a property interest as defined in *Roth." Id.* at n. 17. Similarly in *Colorado Seminary v. NCAA,* 417 F.Supp. 885 (D.Co.1976), the court held that "the interest of future professional careers must nevertheless be considered specula- · tive and not of constitutional dimension." *Colorado Seminary v. NCAA,* 417 F.Supp. at 895. Once again, this Court concurs with the conclusion that future professional careers are mere expectations, far too speculative to command constitutional due process protection.

In holding that Plaintiffs' interests in post-season participation, gaining tournament experience and media exposure through such participation, and professional careers in athletics are just too speculative to rise to the level of a constitutionally protected interest, this Court keeps in mind the endless intervening variables which may arise, and impact on these "hoped-for" opportunities. Health, team record, academic achievement, to name a few, will all impact on Plaintiffs' alleged "claim of right." Therefore, this Court cannot find such wants and desires to satisfy the parameters set forth in *Roth.*

█ If this Court had found that Plaintiffs possessed a constitutionally protectable interest of some kind, the last step in the analysis would be for the Court to consider what due process the Plaintiffs would be entitled to, pursuant to the requirements of the Constitution. The Plaintiffs in the present case allege that the due process violation arose from the Defendant denying the Plaintiffs an opportunity to be heard regarding the Bradley University NCAA rule violations.

The court in *Justice* addressed precisely this point, and held that notice to and an opportunity for hearing given to the University satisfied due process standards. *Justice v. NCAA,* 577 F.Supp. 356, 368 (1983). The court noted that procedural protection required by due process depends upon several factors: (1) private interest affected by the action; (2) risk of erroneous deprivation under the procedures provided; and (3) fiscal and administrative costs of adding additional safeguards. *Id.* See *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

As in the case presently before this Court, the NCAA in *Parish* provided the party upon which sanctions were imposed, the university, with notice of the Committee's preliminary findings. Further, the NCAA through its Infractions Committee gave the university an opportunity to appeal and participate in a hearing on the merits before the NCAA Committee. In *Kelley v. Metropolitan Co. Board of Education of Nashville,* 293 F.Supp. 485 (M.D. Tenn.1968), the court held that notice to the head of the university or school attended by a student satisfies due process in cases where a student athlete's participation has been suspended. In light of this holding, this Court concludes that the acts of the NCAA in notifying and providing hearing to the member institution did in fact satisfy due process.

In addition, as this Court inquired at oral argument, the Plaintiffs in this case were not individually involved with or responsible for the sanctioned violations. As such, there is little evidence, if any, that they could have contributed to an NCAA hearing, if given the opportunity to be heard. Thus, a plea for leniency is likely the only contribution Plaintiffs could have made at such a hearing. As held by the United States Supreme Court in *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977), "where the factual basis for a disciplinary decision is undisputed and an individual wishes only to request

leniency, an additional hearing is not required." *Dixon v. Love*, 431 U.S. at 113–14, 97 S.Ct. at 1727–28.

As previously discussed, this Court cannot conclude that the Plaintiffs' expectancies and "hoped-for" desires rise to the level of constitutional dimensions. Thus, the Court concludes that the Plaintiffs have not been deprived of any constitutionally protected "property" interest as required by the due process clause, and grants Defendant's Motion for Summary Judgment.

In Plaintiffs' response brief, they make the argument that a constitutionally protected property interest arises out of their scholarship agreements with Bradley University. Since such an agreement has no foundation or basis in Count II of Plaintiffs' Complaint, the Court declines to address it.

EQUAL PROTECTION

In Defendant's Motion for Summary Judgment, it characterizes the claim set forth in Count II of the Complaint as one founded upon an alleged equal protection violation. However, the Plaintiffs assert in their Complaint that their relief is founded upon "the equal protection and due process guarantees of the Fourteenth Amendment." The Court agrees with the Defendant, and reads Count II as alleging a claim based upon an equal protection violation. Although the record is very thin as to the merits of this equal protection claim, the Court concludes that the Plaintiffs' equal protection claim also fails.

In Count II of Plaintiffs' Complaint, the Plaintiffs allege a violation of their fundamental rights to prepare for and pursue the vocation of their choosing, and be free of punishment absent personal guilt. As already noted, this Court finds that the acts of the NCAA did not constitute state action. However, for the purposes of this discussion the Court will assume, arguendo, that state action does exist.

■ An equal protection claim requires a plaintiff to show that a particular law, regulation or statute as applied to a particular

group of people, of which plaintiffs are a part, results in dissimilar treatment of the plaintiffs. Plaintiffs were less than clear in characterizing the nature of their claim. In their Complaint, they failed to identify the classification which was allegedly set up by the NCAA's actions. Despite this deficiency in Plaintiffs' equal protection claim, this Court concludes that the intended class is intercollegiate basketball players, playing on member institution teams sanctioned by the NCAA, but who are individually innocent of any NCAA rule violations. Further, the Court concludes that the "dissimilar treatment" that the Plaintiffs intended to allege was the imposition of NCAA sanctions on a team free of individual responsibility for the NCAA rules violations. The result was an alleged impingement of the Plaintiffs' fundamental rights to prepare for and pursue the vocation of their choosing, and be free of punishment absent personal guilt.

■ The equal protection clause guarantees that similar individuals will be dealt with in a similar manner by the government. This does not mean that the government is prohibited from classifying persons or "drawing lines" in creating and applying laws; rather, it does guarantee that those classifications will not be based on impermissible criteria or arbitrarily used to burden a group of individuals. J. Nowak, R. Rotunda & J. Nelson Young, Constitutional Law 586 (2d Ed.1983). Where the classification relates to a proper government purpose, the classification will be upheld. *Id.*

■ Equal protection is a test of whether the classification "lines" were properly drawn. It is the guarantees of procedural due process that determines what process is necessary to find that an individual falls within or outside of a specific classification. J. Nowak, R. Rotunda & J. Nelson Young, Constitutional Law 587 (2d Ed.1983).

There are two standards of review employed by the United States Supreme Court in equal protection analyses. The first is strict scrutiny, and the second, rational relationship. The strict scrutiny standard of review has been held by the United States

Supreme Court to be the appropriate standard of review in cases involving: (1) a government act classifying people in terms of their ability to exercise a fundamental right, and (2) when the governmental classification distinguishes between persons in terms of any right, upon some "suspect" basis. *U.S. v. Carolene Product Company*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938). The rational relationship test has been deemed the appropriate test when reviewing a government classification under equal protection guarantees that does not involve a fundamental constitutional right, suspect class, or the characteristics of alienage, sex, or legitimacy. *Id.*

■ The strict scrutiny standard of review means that the Court will not defer to the decisions of other branches of government, but will instead independently determine the degree of relationship which a classification bears to a constitutionally compelling end. *Horton v. Califano*, 472 F.Supp. 339, 343 (W.D.Va.1979). The application of the strict scrutiny standard of review requires the government to show that the legitimate end is so "compelling" or "overriding" that the limitation imposed upon a fundamental right is justified. *Id.*

Such an analysis is premised upon the presumption that the interest allegedly impinged upon by the government act or legislation is a fundamental right. In the present case, the fundamental rights alleged by Plaintiffs are the right to prepare for and pursue the vocation of their choosing, and the right to be free of punishment absent personal guilt. It is at this very early stage of the analysis that the Plaintiffs' equal protection claim falls. For the Court concludes that the interests asserted by the Plaintiffs do not constitute fundamental rights, which are entitled to constitutional protection under the equal protection guarantees.

"Fundamental rights" are those which have their origin in the express terms of the Constitution or which are necessarily to be implied from those terms; (citation omitted). It is not proper for the courts to pick out certain otherwise and to characterize them as fundamental. (Citation omitted). The test of whether a right is fundamental lies in assessing whether it is explicitly or implicitly guaranteed by the Constitution (Citation omitted). In determining whether a fundamental right exists, the Court must look to the traditions and collective conscience of the people. (Citation omitted). A fundamental right cannot be based on the social or economic importance of an interest. (Citation omitted)."

16A CJS Constitutional Law, § 447 (1984).

■ Plaintiffs' first contention is that they have a fundamental right to prepare for and pursue professional athletic careers. Plaintiffs' argument asserts that the NCAA's ban on the Plaintiffs' participation in post-season intercollegiate basketball tournaments interfers with this right to professional careers. Clearly this is erroneous. Public education is not a fundamental right under the federal Constitution. *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786, rehearing denied 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982); *Texas v. Certain Named and Unnamed Undocumented Alien Children*, 454 U.S. 1077, 102 S.Ct. 629, 70 L.Ed.2d 611 (1981), rehearing denied 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982). Although many state constitutions establish education as a fundamental right, it may be abolished by the state, if done in a non-discriminatory manner. *Petrey v. Flaugher*, 505 F.Supp. 1087 (D.C.Ky.1981).

■ It has been held that even state established fundamental rights to education do not encompass a fundamental right to college or community education. *Gurfinkel v. Los Angeles Community College District*, 175 Cal.Rptr. 201, 121 Cal.App.3d 1 (1981). Furthermore, participation in interscholastic athletics is not a constitutionally protected civil right. *Colorado Seminary (University of Denver) v. NCAA*, 570 F.2d 320 (Ca.Colo.1978); *Albach v. Odle*, 531 F.2d 983 (Ca.N.M.1976). Neither is such interscholastic athletics a property right. *O'Connor v. Board of Ed-*

**614**

*ucation School District No. 23,* 645 F.2d 578 (7th Cir.1981), *cer. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981), on remand 545 F.Supp. 376 (D.C.1982).

 It is well settled law that a right to education is not a fundamental right under the United States Constitution. As such, and in light of the United States Supreme Court's decisions in *Colorado Seminary* and *Parish,* this Court concludes that neither is the right to participate in post-season tournaments. Therefore, the more remote "right" to pursue professional athletic careers cannot be held to establish a fundamental right of constitutional dimension.

 Secondly, the Plaintiffs allege a fundamental right in the right to be free from punishment absent personal guilt. The court in *Justice v. NCAA,* 577 F.Supp. 356 (1983) addressed precisely this point.

As noted in *Justice,* the United States Supreme Court has required the employment of a fundamental right analysis, requiring the state to assert a compelling interest or substantial justification when punishment is not predicated on guilt. *Justice v. NCAA,* 577 F.Supp. at 370. However, this mandate requires that the "punishment" involved constituted at a minimum a deprivation of a property or liberty interest. *Id.* Thus, the Plaintiff is required to first prove the requisite property or liberty interest is established. As this Court has already concluded, the right to participate in post-season tournaments, gain tournament experience and media exposure, secure "hoped-for" professional careers are not constitutionally protected liberty or property interests. As stated by the court in *Justice:*

"The fact that the plaintiffs are innocent of the wrongdoing that led to the imposition of sanctions is truly unfortunate, but it does not in itself elevate the interest at stake to the level of a substative constitutional right protected by the due process clause of the Fourteenth Amendment."

*Justice v. NCAA,* 577 F.Supp. at 370.

Absent such an elevation of Plaintiffs' asserted interests, the application of a fundamental right analysis to this last claim would be inappropriate. The Court concludes that the Plaintiffs' allegations do not possess a fundamental right to be free from punishment absent personal guilt and, therefore, this claim fails.

Although the Plaintiffs obviously intended to allege a strict scrutiny equal protection violation founded upon an impingement of a fundamental right, the Defendant's, in its Motion for Summary Judgment has characterized it as a claim properly analyzed pursuant to the rational relations standard. Therefore, this Court will briefly address Plaintiffs' alleged equal protection violation in light of a rational relation analysis.

 The rational relations standard requires the Court to determine whether the classification established by the Defendant's rule or regulation "rationally [furthers] some legitimate, articulated [state] purpose." *San Antonio Indep. School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Pursuant to this analysis, the Court must first examine the rule to ascertain if it is reasonably related to some legitimate purpose.

 The fundamental purpose of the NCAA is to "maintain intercollegiate athletics as an integral part of the educational program and the athlete, as an integral part of the student body, and by so doing, retain a clear line of demarcation between college athletes and professional sports." NCAA Constitution, Article 2, § 2(a). In pursuit of this goal, the NCAA has developed and adopted a Constitution, By-Laws and regulations to implement its fundamental purpose and promote uniformity of standards for the development of "educational leadership, physical fitness, sports participation as a recreational pursuit and athletic excellence." NCAA Constitution, Article 2, § 1(a).

Based upon the sheer number of institutions which are active members of the NCAA, it is obvious that intercollegiate

athletics is regarded as an important *adjunct* to the academic curriculum. Detailed rules regarding the recruiting of high school athletes is an integral part of the NCAA's rules. Thus, recruiting rules, as do many other of the NCAA's rules, vindicate the association's legitimate interest in educational values.

This Court concludes that restrictions regarding a member institutions' contact and encouragement of high school athletes to attend its institution is rationally related to the NCAA's fundamental purpose of promoting *both* educational and athletic values. Therefore, this Court finds that the NCAA's recruiting rules are rationally related to the NCAA's legitimate purpose, as set out in its statement on fundamental purpose. Constitution, Article 2, § 2(a).

For a rule to have meaning it must have a means through which it can be enforced. Without some form of penalty, the rule would be meaningless, leaving member institutions free to do as they pleased in recruiting high school athletes. Like the rule, the penalty must be rationally related to the rule's purpose, but no more is required. *Associated Students, Inc. of California State University—Sacramento v. NCAA*, 493 F.2d 1251, 1256 (9th Cir.1974).

As previously discussed, the purpose of the NCAA recruiting rules is to prevent member institutions' athletic departments from influencing high school athletes, in the throws of making secondary education decisions, to the exclusion of other educational considerations and values. The use of member institution team suspension from post-season competition is a means by which the NCAA can enforce this rule and mandate compliance. While the Court recognizes that "the stakes are high," it also recognizes that if there was no sanction for violation, the rule would actually be nothing more than illusory. The necessity for a severe penalty is particularly highlighted by the fact that in the face of a severe penalty, some member institutions nonetheless violate the NCAA recruiting rules.

Intercollegiate athletic teams generate widespread interest. Therefore, the suspension of a member institution for NCAA rule violations subjects the responsible officials to the disgrace of the member institution's trustees, alumni, and fans, as well as the community. For these reasons, "the sanction of suspending a successful team from post-season tournament competition visits powerful social and political pressures on those officials." *Moreland v. Western Pa. Interscholastic, Etc.*, 572 F.2d 121, 126 (3rd Cir.1978). Thus, "the rules serve a noteworthy societal and moral purpose." *Id.*

It is unfortunate that the Plaintiffs are adversely affected by sanctions imposed for the misconduct of persons no longer in attendance at Bradley University; however, such a result is to some extent unavoidable under the present system. Investigations by the NCAA into alleged rule violations takes time, and sometimes, much time. Yet, the obvious necessity of such sanctions is clear.

"The fact that the NCAA can take action only against the member institution and not the guilty individuals appears at first to undermine the effectiveness of the sanctions. Upon closer examination, however, it becomes clear that the rules providing for direct sanctions against member institutions provide the instructions with a strong incentive to police and prevent misconduct in their athletic programs. Were the sanctions directed only at the players and staff members who were involved in the infractions rather than the university—one of the alternative sanctions suggested by Plaintiffs—University officials would have little to lose and everything to gain by turning their backs on misconduct by athletic staff members, for overzealous coaches could be replaced as quickly as they are reprimanded by the NCAA." *Justice v. NCAA*, 577 F.Supp. at 373.

It is the opinion of this Court that the NCAA's recruiting rules and associated sanctions which flow from a violation of these rules, do not create a classification which violates the equal protection clause of the Constitution. Therefore, the De-

fendant's Motion for Summary Judgment as to Count II of the Complaint is GRANTED.

The Court declines to publish its discussion of Plaintiffs' claims of tortious interference with contractual relations, Count III, and laches, Count IV.