February 5, 1999

NO. 5-98-0595

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________

KEVIN JORDAN, a minor by his step- )  Appeal from the

father and next friend, George     )  Circuit Court of

Edwards, Jr.,                      )  St. Clair County.

                                   )

     Plaintiff-Appellant,          )

                                   )

v.                                 )  No. 98-MR-247

                                   )

O'FALLON TOWNSHIP HIGH SCHOOL      )

DISTRICT NO. 203 BOARD OF          )

EDUCATION, DENNIS GRIMMER, and     )

MARK GREENBERG,                    )  Honorable

                                   )  Robert J. Hillebrand,

     Defendants-Appellees.         )  Judge, presiding.

_________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

This case examines how O'Fallon Township High School (O'Fallon) officials withheld a student's participation in interscholastic athletics as punishment for his violation of the school's zero-tolerance conduct code.  Before they are allowed to participate in any extracurricular activity, all O'Fallon students must agree in writing to abide by the code's ban on alcohol and drug use.  Students who violate the code's ban are disciplined by school officials under procedures that do not necessarily comport with due process.  School officials imposed discipline in this case without affording the student a formal hearing.  The student was not allowed to confront witnesses who provided the evidence upon which the discipline was based.  Nor was the student permitted to present witnesses to rebut that evidence.     

The student sued to enjoin the disciplinary action.  The trial court refused to grant an injunction, and the student appealed. 

   On appeal, the student claims that O'Fallon school officials violated the procedural due process component of the fourteenth amendment. U.S. Const., amend. XIV.  He argues that school officials were constitutionally obliged to afford him a minimal due process hearing before discipline could be administered.  Next, he relies on section 24-24 of the School Code (105 ILCS 5/24-24 (West 1996)), which guarantees notice and a hearing before school officials can ban anyone from attending athletic or extracurricular events.  He argues that the proper interpretation of this provision called for notice and a hearing in this case.  Finally, he contends that school officials acted in an arbitrary and capricious manner by using information that had been disclosed in violation of section 1-7(8) of the Juvenile Court Act of 1987 (705 ILCS 405/1-7(8) (West 1996)). 

We now decide whether a talented high school football player with college athletic scholarship opportunities possesses an interest in playing high school football that due process protects.  We further decide whether section 24-24 of the School Code creates and defines a right to notice and a hearing for participants in interscholastic athletics.  Finally, we decide whether discipline based on information improperly disclosed under the Juvenile Court Act of 1987 was administered in an arbitrary and capricious manner.  We conclude that O'Fallon school officials dispensed that process which was due and acted reasonably under the circumstances presented.  

The 1997 O'Fallon High School football season highlighted the skills of a young man named Kevin Jordan.  Jordan's ability to break tackles and find daylight brought several postseason honors, including his selection as team captain for the ensuing 1998 season.  Jordan's ability also drew the attention of several universities.  College coaches from across the country wrote to Jordan and expressed their interest in his future.  Although the coaches did not extend scholarship offers, they clearly suggested that such offers would be forthcoming provided Jordan continued to excel as a high school football player in his senior season.      

Thus, the 1998 season appeared to offer Jordan a legitimate chance to earn an athletic scholarship to a major university.  The season's promise ended, however, when Jordan's playing privileges surrendered to enforcement of O'Fallon's zero-tolerance conduct code.  School officials determined that Jordan violated the code's ban on alcohol use.  As a result, the captain of O'Fallon's football team was suspended from play for the entire 1998 season.  Kevin Jordan never played another down of high school football.     The suspension stemmed from an early morning encounter with O'Fallon police officers.  The officers answered Jordan's 9-1-1 emergency call from a phone booth near an O'Fallon convenience store.  When they arrived at the convenience store, they found a dishevelled and shoeless Jordan standing in the parking lot.  It was 3 o'clock in the morning, and according to the officers, Jordan evidenced obvious signs of inebriation.  His eyes were glazed, his speech was slurred, and he smelled of alcohol.  Jordan's condition was confirmed when, according to the officers, he admitted to alcohol consumption.               

The officers, pursuant to a reciprocal reporting agreement with the school, reported the incident to O'Fallon school officials.  An assistant principal reviewed their report, discussed it with them, and confronted Jordan.  Jordan denied alcohol use.  He also denied any admission to the contrary.  He explained that his condition resulted from an attack by unknown assailants who threw beer bottles at him during the assault.  He insisted that the smell of alcohol detected by the officers was misconstrued.         The assistant principal weighed what the officers and Jordan told him and decided that Jordan violated his commitment to remain alcohol- and drug-free.  Jordan had a prior violation of the code's alcohol ban.  Therefore, the assistant principal cited him for a second violation and informed him that he was suspended from participation in high school athletics for a period that encompassed the entire football season.               

The assistant principal's action was reviewed by the O'Fallon Activity Council (Activity Council).  The Activity Council is a body comprised of the principal, all assistant principals, the dean of students, the athletic director, the assistant athletic director, the band director, the head of speech activities, and the student council sponsor.  The Activity Council reviews discipline only to determine whether the conduct code is interpreted consistently and applied uniformly.  Its members agreed unanimously that the code was properly applied in Jordan's case.            

Jordan's stepfather appealed to the school superintendent, who was empowered to review and override the disciplinary action.  After agreeing to review the matter, the superintendent met with Jordan, his attorney, and his stepfather.  Jordan, assisted by counsel, reiterated his version of the early morning encounter with O'Fallon police officers.  Jordan was afforded the opportunity to present any information or make any comment he deemed important to the superintendent's review.        

The superintendent listened to everything Jordan presented and reserved judgment until he could meet with the officers involved in the incident.  Jordan's attorney was apprised of a planned meeting with the officers and was invited to attend.  His schedule did not permit attendance, and the meeting was held without him.            The superintendent told the officers of Jordan's claims.  The officers questioned the veracity of those claims, noting that Jordan's story had significantly changed from what he had earlier told them.  They insisted that Jordan admitted to them that he had been drinking alcohol.  They also expressed their opinion that Jordan's glassy eyes and slurred speech were the result of alcohol consumption.  The possibility that the smell of alcohol resulted from an assault with beer bottles did not alter their opinion of Jordan's inebriated condition.

The superintendent told Jordan's attorney what the officers  conveyed to him.  He advised Jordan's attorney that he would not overrule the suspension and invited him to appeal to the O'Fallon Board of Education, the final arbiter of student discipline.   

Throughout this process, Jordan's stepfather and attorney repeatedly requested a more formal proceeding.  They wanted to confront the police officers and to call witnesses who could account for most of Jordan's activities on the night in question. Their call for a formal hearing went unheard.                   

Jordan did not appeal to the O'Fallon Board of Education.  Instead, he commenced this action.  He obtained a temporary restraining order that enjoined the suspension.  The matter proceeded to a hearing on Jordan's request for a preliminary injunction pending a trial on the merits of the underlying lawsuit.  Jordan argued that the disciplinary action was arbitrary and capricious and that the procedures employed were constitutionally infirm.  The trial judge found that the evidence failed to establish a protected property or liberty interest.  Therefore, the judge did not determine whether the process afforded met minimal constitutional procedural standards.  He did hold, however, that the disciplinary action was neither arbitrary nor capricious.  This appeal ensued.      

Jordan challenges the school's power to sideline him in the manner employed.  He argues that school officials cannot suspend him from participation in interscholastic athletics without first affording him a minimal due process hearing to contest the disciplinary action.  At a minimum, he claims a right to confront his accusers and to present witnesses who could corroborate his denial of alcohol use.                                              The fourteenth amendment forbids the State to deprive any person of life, liberty, or property without due process of law. U.S. Const., amend. XIV.  Therefore, any person who raises a procedural due process claim must demonstrate that a protectable property or liberty interest is at stake.  
Hawkins v. National Collegiate Athletic Ass'n
, 652 F. Supp. 602, 610 (C.D. Ill. 1987). Protected property interests are created "`and their dimensions are defined' by an independent source such as State statutes or rules entitling *** citizen[s] to certain benefits."  
Goss v. Lopez
, 419 U.S. 565, 572-73, 42 L. Ed. 2d 725, 733, 95 S. Ct. 729, 735 (1975), quoting 
Board of Regents of State Colleges v. Roth
, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709 (1972).  In 
Board of Regents of State Colleges
, the Supreme Court addressed the parameters of a constitutionally protected property interest.  In reviewing several cases that defined protected property interests in different contexts, the Supreme Court wrote:

"Certain attributes of `property' interests protected by procedural due process emerge from these decisions.  To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  
Board of Regents of State Colleges
, 408 U.S. at 577, 33 L. Ed. 2d at 561, 92 S. Ct. at 2709.

Based upon this definition, courts have repeatedly held that there is no property or liberty interest in taking part in interscholastic athletics.  
Clements v. Board of Education of Decatur Public School District No. 61
, 133 Ill. App. 3d 531, 533, 478 N.E.2d 1209, 1210 (1985).                                       Students can need, want, and expect to participate in interscholastic athletics, but students are not 
entitled
 to participate in them.  Football is neither an integral part of a quality education nor a requirement under any rule or regulation governing education in this State.  Consequently, not every public high school in this State fields a football team.  Those students who attend O'Fallon Township High School thus enjoy an opportunity that many other high school students are not permitted to enjoy.  Simply put, playing high school football is a privilege rather than a right.  
Todd v. Rush County Schools
, 133 F.3d 984, 986 (7th Cir. 1998).   

Jordan concedes that, standing alone, participation in interscholastic athletics does not rise to the level of a protected interest.  Most students can be suspended from play without a constitutional right to a due process hearing.  Notwithstanding, Jordan thinks that he should be treated differently.  His reasoning follows.                      

Since he possesses athletic prowess, his participation in high school football can develop into something of substantial economic value.  Unlike his less talented teammates, Jordan can turn participation in interscholastic athletics into a college scholarship.  His participation thus rises to a protectable property interest that commands procedural due process.  It follows that school officials could not ban him from a playing field where scholarship opportunities awaited, without first conducting a minimal due process hearing.   

This argument is untenable.  Since Jordan possessed no independent right to participate in high school football, the existence of a protected property interest depends upon whether he can legitimately claim the right to participate in order to earn college financial assistance.  This in turn depends upon whether the hope of earning a college scholarship rises to the level of a protectable property interest.  Under the circumstances presented, it does not.

Scholarship opportunities do not elevate participation in interscholastic athletics into an interest that due process protects because such opportunities are themselves mere expectancies.  The acquisition of a scholarship remains contingent on far more than simply maintaining playing privileges.             Jordan's expectations of playing college football on an athletic scholarship were no doubt greater than those of other less talented players.  Nevertheless, those expectations are no more constitutionally protected than less realistic expectations harbored by others.  Jordan was not entitled to an athletic scholarship at the time when school officials considered disciplinary action.  Nor did continued participation in high school football guarantee that his scholarship expectations would be fulfilled.  Since Jordan's scholarship hopes could not meet the criteria for a protected property interest, those hopes could not impart due process protection to participation in high school football.

In holding that the opportunity to earn an athletic scholarship is too speculative to elevate participation in high school football to the level of a constitutionally protected interest, we note several contingencies that impact scholarship hopes.  Here, Jordan would have had to again excel on the playing field.  He would have had to meet academic and entrance exam requirements.  He would have had to overcome the unreliable image that his disciplinary problems conveyed.  And, most importantly, he would have had to stay healthy.                     

In this regard, it helps to consider the true nature of college football.  It is a competitive business that exists in large part to produce the revenue that fuels college athletic programs.  Its revenue-producing role operates upon a simple understanding of the relationship between winning and ticket sales.  College coaches are strongly motivated to produce winning football teams.  Therefore, they scour the country for good football players to fill their rosters.                         

College coaches possess a finite number of athletic scholarships to offer.  Because they vie with each other for the best available talent, coaches must recruit more athletes than they have scholarships to offer.  Their ultimate goal is to convince the best players to play for them.  One thing is clear--college coaches do not hand out athletic scholarships to players that are physically incapable of playing college football.  The names of seriously injured players are not found on recruiting lists.        This look at college football's character tells us why even a player with obvious college-level skills can harbor no more than an expectation of college financial assistance so long as he is still playing high school football.  Football can exact a swift and permanent toll on any player's scholarship hopes.  The vagaries of the game do not spare talented players and have crushed the aspirations of some of the very best.  An athletic scholarship offer can vanish from a running back's future as swiftly as a healthy knee.  Therefore, athletic scholarships remain expectancies, regardless of a player's talent level, until that player completes high school football with his health firmly intact.  A player's hopes, no matter how justified, cannot elevate his high school playing privileges to a protectable property interest at any stage where disciplinary action would be taken against those privileges.       

Jordan did not possess the right to participate in interscholastic athletics.  Nor did his scholarship opportunities confer such a right.  Therefore, a protectable property interest was not at stake when the school imposed discipline, and a due process hearing was not required.            

Common sense supports this position.  Most students engaged in nonathletic extracurricular activities could legitimately claim a right to due process disciplinary hearings based upon their scholarship hopes.  Academic scholarships are the pursuit of students engaged in all manner of extracurricular activities.  Participation in such activities often differentiates students with comparable academic credentials and spells the difference in obtaining scholarship awards.                                       Similarly, most students engaged in interscholastic athletics could legitimately claim a right to due process disciplinary hearings based upon their scholarship hopes.  The opportunity to earn an athletic scholarship exists, in uncertain degree, for all participants in interscholastic athletics.  The hopes harbored by a freshman athlete are more speculative than those that Jordan held, but until that freshman matures and completes athletic participation, there exists no reason to discount those hopes and exclude due process protection.  

We are consistently reluctant to intrude upon the disciplinary decisions of school districts.  
Donaldson v. Board of Education for Danville School District No. 118
, 98 Ill. App. 3d 438, 439, 424 N.E.2d 737, 738-39 (1981).  If the opportunity to earn college financial assistance were to elevate participation in interscholastic athletics into a protected property right, school districts would have to afford procedural due process in practically all disciplinary actions where student participation in outside activities was at stake.  We cannot accept a notion that would invite a due process claim by every student engaged in interscholastic athletics and extracurricular activities.  Judicial intervention in school discipline would become the rule rather than the exception unless school districts provided due process hearings in all such disciplinary actions.                 

Next, Jordan relies on a section of the Illinois School Code that expressly provides for notice and a hearing before school officials can ban anyone from attending an athletic or extracurricular high school event.  See 105 ILCS 5/24-24 (West 1996).  He argues that this statutory provision extends the right to notice and a hearing to anyone who participates in athletics and extracurricular events, as well as to those who merely wish to attend.                     

Section 24-24 of the School Code reads in pertinent part:

"The board [of education] may make and enforce reasonable rules of conduct and sportsmanship for athletic and extracurricular school events.  Any person who violates such rules may be denied admission to school events for not more than one year, provided that written 10 days['] notice of the violation is given such person and a hearing had thereon by the board pursuant to its rules and regulations.  The administration of any school may sign complaints as agents of the school against persons committing any offense at school events."  105 ILCS 5/24-24 (West 1996).                 

Jordan argues that this provision entitled him to notice and a formal hearing before his playing privileges were lifted.  He construes the statutory provision as follows.                       The statute clearly prohibits school administrators from barring admission to school activities without notice and a hearing.  Thus, students who wish to merely attend and observe school activities receive notice and a hearing before admission can be denied.  Students who actually participate in school activities possess an interest that far exceeds the interest of those who only wish to attend those activities.  Hence, it would be incongruous to construe the statute as applicable to those who merely wish to attend but not to those who actually participate in school events.  Jordan argues that by passage of this statute our legislature intended to bestow the right to notice and a hearing before the playing privileges of high school football players could be suspended by school officials.                              

We are not convinced that legislators had Jordan in mind when they enacted this statutory provision.                            

The primary rule of statutory construction, to which all other rules are subordinate, is to ascertain and give effect to the true intent of the legislature.  
Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.
, 158 Ill. 2d 76, 81, 630 N.E.2d 820, 822 (1994).  The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning.  
Kraft, Inc. v. Edgar
, 138 Ill. 2d 178, 189, 561 N.E.2d 656 (1990).  If legislative intent can be ascertained from the statute's plain language, that intent must prevail without resort to other interpretive aids.  
People v. Fitzpatrick
, 158 Ill. 2d 360, 364-65, 633 N.E.2d 685 (1994).  "The court's only legitimate function is to enforce the law as written."  
Cripe v. Leiter
, 184 Ill. 2d 185, 200, 703 N.E.2d 100, 107 (1998) (Harrison, J., dissenting), citing 
People v. Rissley
, 165 Ill. 2d 364, 391, 651 N.E.2d 133, 145 (1995).  Our decision is guided by a plain reading of the statute.              

The statute clearly authorizes the adoption of a conduct and sportsmanship code to which everyone who attends athletic and extracurricular events must adhere.  It then empowers the enforcement of that code by express means.  Violators can be denied admission to athletic and extracurricular events for up to one year, provided school administrators serve notice and conduct a hearing to decide if a violation occurred.  Clearly, this provision of the School Code is not confined to students but applies to all who wish to attend school activities.  By its plain language, it is not intended to provide notice and hearings for high school football players who violate their commitment to avoid alcohol and drugs.  It is intended to provide notice and a hearing to anyone who school administrators think violated the conduct and sportsmanship code for spectators at school events.  By its plain language, it provides a right to notice and a hearing before school administrators can bar future admission to school events because of some behavioral breach of the conduct and sportsmanship code at a past event.       

The citizens of this State are entitled to enter public places.  They possess a protected interest in admission to high school stadiums, gymnasiums, theater halls, and ballparks where high school events are held.  Public high schools that sponsor athletic and extracurricular events would have limited authority to ban people from attending such events absent this provision.    

The language of this statutory provision reflects but one clear purpose--to enforce reasonable spectator behavior and maintain appropriate and sportsmanlike conduct at school events.  It empowers school administrators to allow students to compete and to perform before behaved audiences, by depriving misbehaved spectators of their right to otherwise attend.  Since a right is at stake, the legislature provided for notice and a hearing before it could be taken away.                         

Our legislature did not intend to restrict school officials in the enforcement of zero-tolerance student conduct codes by its passage of this provision.  Legislators know how to clearly restrict school disciplinary action and bestow due process protection for students when it is their purpose to do so.  See 105 ILCS 5/10-22.6 (West 1996).  It was not their purpose in this case.  Section 24-24 of the School Code does not create and define a right to notice and a hearing for participants in interscholastic athletics.  School officials can administer discipline for zero-

tolerance conduct code violations without formal notice and hearing.                 

Of course, school officials cannot impose student punishment in a completely arbitrary and capricious manner.  See 
Robinson v. Illinois High School Ass'n
, 45 Ill. App. 2d 277, 286, 195 N.E.2d 38, 43 (1963).  In order to establish a violation of a student's substantive, rather than procedural, due process rights, the student must show arbitrary and capricious conduct on the part of school officials.  
Peterson v. Independent School District No. 811
, 999 F. Supp. 665, 673 (D. Minn. 1998). 

Jordan asserts that school officials violated his right to confidentiality under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 
et seq.
 (West 1996)).  He argues that school officials acted in an arbitrary and capricious manner by using confidential information to discipline him.               

Section 1-7 of the Juvenile Court Act of 1987 proscribes, subject to certain express exceptions, the disclosure of law enforcement records, their contents, or the identity of any minor in connection with the investigation or disposition of any case involving a minor.  It reads in pertinent part:                     "(A) Inspection and copying of law enforcement records maintained by law enforcement agencies that relate to a minor who has been arrested or taken into custody before his or her 17th birthday shall be restricted to the following: 

* * *

(8) The appropriate school official.  Inspection and copying shall be limited to law enforcement records transmitted to the appropriate school official by a local law enforcement agency under a reciprocal reporting system established and maintained between the school district and the local law enforcement agency under Section 10-20.14 of the School Code concerning a minor enrolled in a school within the school district who has been arrested or taken into custody for any of the following offenses:

(i) unlawful use of weapons ***;

(ii) a violation of the Illinois Controlled Substances 

Act;

(iii) a violation of the Cannabis Control Act; or

(iv) a forcible felony ***."  705 ILCS 405/1-7(A)(8) (West 1996).

O'Fallon High School established a reciprocal reporting agreement between it and the O'Fallon Police Department pursuant to section 10-20.14 of the School Code (105 ILCS 10-20.14 (West 1996)).  Jordan's encounter with the O'Fallon police officers was reported to O'Fallon school officials pursuant to that reciprocal reporting system.  School officials were provided the official police report of the incident.                                

We agree with the Attorney General's view of the relationship between the Juvenile Court Act of 1987 and the School Code:   

"There is no indication that any reciprocal reporting agreement developed pursuant to section 10-20.14 of the School Code was intended to operate as an exception to the provisions of either the Juvenile Court Act or the Illinois School Student Records Act.  Indeed, the subsequent enactment of the specific exception in subsection 1-7(A)(8) of the Juvenile Court Act tends to negate any such presumption.

*** 

*** [I]t is my opinion, with respect to reporting by law enforcement agencies, that a reciprocal reporting agreement must necessarily be limited to the specific offenses referred to in subsection 1-7(A)(8) of the Juvenile Court Act."  1996 Ill. Att'y Gen. Op. ___, No. 96-040, at 4.  

The O'Fallon police report provided to O'Fallon school officials did not pertain to the specific offenses referred to in section 1-7(A)(8) of the Juvenile Court Act of 1987.  Therefore, O'Fallon police officers were compelled to guard its confidentiality.  This they did not do.  The question remains whether the officers' breach of the Juvenile Court Act of 1987 affects the disciplinary action taken by O'Fallon school officials.   We believe that O'Fallon school officials acted in good faith.  Once school officials received the information, they were not obliged to ignore it simply because it should not have been disclosed.  In fact, we believe they were obliged to pursue it.     Jordan was a prior offender of the school conduct code's ban on alcohol use.  School officials counseled him after his initial violation.  They warned him that another violation would strip him of playing privileges for the entire season.  The information officials received was therefore particularly alarming.  Any course other than that which O'Fallon school officials pursued would have constituted the unreasonable path.                

We do not condone the release of a juvenile police report in violation of mandated confidentiality.  We trust that O'Fallon police officers will understand the scope of the reciprocal reporting agreement in the future.  However, O'Fallon school officials were not precluded from commencing disciplinary action  once they were aware of the information the report contained.  Whether school officials acted in an arbitrary or capricious manner does not turn on how they came to acquire information of alcohol use.  It turns on how they used that information and the processes they employed.                                           

We find that the disciplinary process that O'Fallon school officials employed was reasonable under the circumstances presented.  Jordan was afforded the opportunity to be heard.  Despite the informal nature of the process, Jordan's lawyer was permitted to present the school superintendent with any information deemed favorable to a review of the disciplinary action.  This included the existence of witnesses who could attest to Jordan's alcohol-free condition when he left their presence three hours prior to the police encounter.  Jordan's lawyer was invited to attend a conference with the police officers.  He was further invited to appeal to the O'Fallon school board.  We find nothing arbitrary or capricious about the inquiry method or the discipline it produced.  

For the reasons stated, we affirm the trial court's order denying a preliminary injunction.

Affirmed.

CHAPMAN and GOLDENHERSH, JJ., concur.