Reginale HALL, and Annette Hall, Plaintiffs,

v.

The NATIONAL COLLEGIATE ATH-LETIC ASSOCIATION, and Bradley University, Defendants.

No. 97 C 7287.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 21, 1997.

David Odom, Odom & McFarland, Chicago, IL, for Plaintiffs.

Bedell Tippins, Lord, Bissell & Brook, Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

KEYS, United States Magistrate Judge.

Before the Court is Plaintiffs' application for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65. For the reasons set forth below, the Court denies Plaintiffs' application for a preliminary injunction.

### *PROCEDURAL HISTORY*

Plaintiffs filed the underlying nine count Verified Complaint for Injunctive Relief and Damages ("Complaint"), on October 17, 1997, and at the same time moved for a temporary restraining order ("TRO"), preliminary injunction, and expedited discovery. On that same date, an ex parte TRO was issued by Judge Blanche M. Manning. The expiration date of that first TRO was October 22, 1997. On October 21, 1997, another TRO was issued by Judge Manning. That TRO also ordered that expedited discovery was to be served on October 22, 1997, with responses due by October 27, 1997. Further, the second TRO set a hearing on Plaintiffs' motion for preliminary injunction for October 31,

1997—the same date the second TRO would expire. The preliminary injunction matter was referred to this Court on October 29, 1997. On October 31, 1997, this Court held an all-day evidentiary hearing on Plaintiffs' motion for preliminary injunction.[1] On November 4, 1997, the parties consented to the exercise of jurisdiction by this Court, exclusively, for all matters arising in the case. This Court issued a third TRO on November 4, 1997, which expires today, November 21, 1997.

## FINDINGS OF FACT [2]

### I. The Parties

Reginale Hall ("Reggie") is a 6'7" tall, eighteen year old African–American who excels at basketball, and aspires to play professionally some day. Reggie graduated from Providence St. Mel High School ("St. Mel" on June 1, 1997. St. Mel is a private, Catholic high school with a student body comprised entirely of African–Americans. Reggie was highly recruited nationally by a number of colleges and universities, including Bradley University ("Bradley") in Peoria. He is currently a freshman at Bradley.

Annette Hall is Reggie's mother. The National Collegiate Athletic Association ("NCAA") is an unincorporated association made up of approximately 1,200 member institutions—typically public and private colleges and universities located throughout the United States. NCAA members establish general policies at annual conventions, and then various cabinets and committees are responsible for implementing those policies throughout the year. The NCAA, according to its constitution and bylaws, has several purposes, including improving intercollegiate athletic programs and encouraging members to adopt eligibility rules that comply with satisfactory standards of scholarship, sportsmanship, and amateurism. Bradley is a member of the NCAA, Division I.

### II. The Dispute

The matter at bar involves, for the most part, a dispute over four courses that Reggie took while enrolled at St. Mel. The inclusion or exclusion of the four courses—Microsoft Office, Microsoft Works, Scripture, and Ethics/Morality—is critical to the Court's analysis of the propriety of the NCAA's ultimate determination that Reggie is ineligible to play Division I basketball this year.

### III. NCAA Eligibility Requirements

Pursuant to the bylaws, the NCAA has established minimum academic eligibility requirements that a new college student must fulfill in order to attain the status of "qualifier".[3] As a "qualifier" a student is eligible to practice with intercollegiate teams, compete in intercollegiate events, and receive financial aid or scholarships.[4] NCAA members are prohibited from permitting "nonqualified" students—those who fail to attain either aforementioned status—to practice with the intercollegiate teams, to compete in intercollegiate events, or to receive financial aid (other than purely need based).

1. The Court denied Plaintiffs' eleventh hour motion to continue the preliminary injunction hearing. In that motion, Plaintiffs sought to postpone the hearing because they had not yet received all the discovery responses to which they allegedly were entitled. The Court, however, found that Plaintiffs had ample notice of the hearing date and should have filed a motion to compel or more timely contacted the Court, if there was indeed a discovery problem, rather than waiting until the close of business on the day before the hearing.

2. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

3. The NCAA established these particular criteria that graduating high school seniors must meet, to be eligible to compete as freshmen at NCAA member institutions, in order to specifically protect the entering student athletes by assuring that they have high prospects for graduating. After the freshman year, as long as the athlete meets the university's requirements (and those of the conference the university participates in), then the NCAA does not have objections to the athlete playing competitively during the next three years. (Tr. at 100.)

4. Alternatively, a student may attain the status of "partial-qualifier" and be eligible to train with the intercollegiate teams and receive financial aid during the freshman year. However, a "partial qualifier" may not compete in intercollegiate events until the sophomore year (if additional GPA requirements have been satisfied).

To be a "qualifier", NCAA eligibility requirements for Division I competition mandate that the student have taken at least thirteen high school "core courses" and that the student have achieved a specified minimum grade point average ("GPA") in those "core courses", as well as a specified minimum score on either the Scholastic Aptitude Test ("SAT") or American College Testing Program ("ACT"). Those specified GPA and standardized test minimums are determined on a sliding scale basis; the higher the test score, the lower the required core GPA. If a student has more than thirteen "core courses", the core GPA is computed from the thirteen highest grades.

## IV. *"Core Courses"*

The NCAA must approve of any class claimed by a high school to be a "core course". The NCAA generally defines "core courses" as recognized academic courses (as opposed to vocational or personal-service courses) offering fundamental instructional components in specified areas of study. (Mem.Supp.Mot. Dismiss, Ex. 1.) At least 75% of the instructional content of such a course must be in one or more of the required areas of study, set forth in the NCAA bylaws, like English, mathematics, natural science, and social science. (Mem.Supp.Mot.Dismiss, Ex. 1.) In addition to these areas of study, a student must also take "additional core courses" in at least one of the following subjects: foreign language, computer science, philosophy, or comparative religion. (Mem.Supp.Mot.Dismiss, Ex. 1.)

In order to qualify as core courses, religion classes must be non-doctrinal. St. Mel's Ethics/Morality class syllabus, however, was entitled "Growing in Christian Morality". (Defs.' Ex. 19.) Course work included prayer, chapel visits, journal/reflection, and study of the Christian vision of morality. (Defs.' Ex. 19; Tr. 149–50.)

Reggie's guidance counselor at St. Mel, Art Murnan, had serious doubts about whether the Scripture class "would get through or not". (Tr. at 134, 147.) The textbook for that course was The New American Bible, with the New Catholic translation. (Defs.' Ex. 11.) The textbook's table of contents included an introduction to the Catholic Study Edition, a history of how the Bible came about, the purpose of the Bible, how to study the Bible, a list of the Catholic Popes, suggested readings for the liturgical year, and Sunday readings of holy scripture. (Defs.' Ex. 11.)

As to the two Microsoft computer courses at issue, it was Mr. Murnan's understanding that, as long as a computer class went beyond keyboarding and word processing, it qualified as a core course. (Tr. at 158.) However, the NCAA Initial–Eligibility Clearinghouse ("Clearinghouse"), which is an independent contractor with the NCAA (Tr. at 221), and not a party to this lawsuit,[5] stated that, for a computer science course to count as an "additional core course", "at least 75 percent of the instruction in the course must go beyond keyboarding and word processing *and* must be in areas such as the development and implementation of electronic spreadsheets, electronics networking, database management and computer programming." (Defs.' Ex. 14.) (emphasis added).

According to the Microsoft Office course syllabus, one of the goals of the class was "to develop enough keyboarding skill to be able to do useful work in a timely manner." (Defs.' Ex. 17; Tr. at 144.) The other goal was "to demonstrate the knowledge and understanding of the basic functions of Microsoft Office; these are included but are not limited to: Word Processing...." (Defs.' Ex. 17; Tr. at 144–45.) St. Mel's principal, in a December 1996 letter he sent to the Clearinghouse, said that "[t]here is no keyboarding practice in this class." (Defs.' Ex. 20.) Contrastingly, the course syllabus stat-

---

5. In light of the Court's disposition of this petition, there is no need to address, at this time, whether the Clearinghouse is a necessary party to this action.

However, since it is unclear from the evidence whether the Clearinghouse, the NCAA, or both, made the decisions at issue here (and also un-

clear whether the NCAA and the Clearinghouse are accountable for each other's decisions/actions), the Court will assume for purposes of this Memorandum Opinion and Order that all decisions were either made by, or attributable to, the NCAA.

ed that "[k]eyboarding practice will be included in the course work." (Defs.' Ex. 17.) Additionally, the Microsoft Office course syllabus, for the first quarter, included: keyboarding skills, correct posture for typing, intermediate keyboarding, introduction to the software, word processing, and advanced word processing. (Defs.' Ex. 17.) Nothing in the entire first quarter qualified as computer science under the Clearinghouse's definition. (Tr. at 146.) In fact, according to the syllabus, 50% of the class was spent on instruction/skills explicitly excluded from the NCAA's definition. Therefore, even if the remaining 50% of the semester was spent entirely on fulfilling "core" computer science components (and it is not at all clear that the remaining instruction would have), that remainder would cover only 50% of the course—thereby falling short of the 75% necessary to count as a core class.

Similarly, the Microsoft Works course syllabus for the first quarter included keyboarding, posture, intermediate keyboarding, and formatting diskettes. (Defs.' Ex. 18.) St. Mel's principal, in that same letter to the Clearinghouse, dated December 1996, said that "[t]here is no keyboarding practice in this class." (Defs.' Ex. 20.) Again, the course syllabus stated that "[k]eyboarding practice will be included in the course work." (Defs.' Ex. 18.)

Given the foregoing, the Court finds that the Clearinghouse, and ultimately the NCAA, was correct in determining that these four courses did not fulfil the requirements of core courses, and that such determination was not made arbitrarily or in bad faith. Furthermore, the Halls have not proven that either the Clearinghouse, or NCAA, applied the core course criteria differently to applicants of different races.

## V. *Guidance Reggie Received While at St. Mel and the Attempt to Qualify the Four Disputed Courses as Core*

The Halls contend that they were not given timely notice of potential core GPA prob-

lems. They apparently contend that Reggie's difficulty in achieving the prerequisite core GPA/ACT was not communicated to them, and that they had no idea that his eligibility was in jeopardy (until after he graduated). This contention, however, is not credible. The Halls were at least generally aware of the NCAA's requirements. (Tr. at 55, 103–107, 113–14.) Bradley also alerted them to Reggie's potential problem multiple times.

Bradley, through its assistant basketball coach, Pat Donahue, maintained a great deal of contact with the Halls during the latter part of Reggie's high school tenure. On several occasions, Bradley provided the Halls with written guidelines on the specific grades Reggie needed to achieve in order to be eligible to play college basketball.

Around the start of Reggie's senior year of high school, on August 1, 1996, Coach Donahue wrote to the Halls (after reviewing Reggie's transcript) and outlined the classes and grades (as well as the ACT score) necessary for NCAA eligibility. (Defs.' Ex. 1.) Coach Donahue noted in his letter that "[t]heir [sic] is lots of work to do...." (Defs.' Ex. 1.) Coach Donahue's calculation of necessary classes did not include the four courses at issue here: Microsoft Works, Microsoft Office, Ethics/Morality, and Scripture.[6] (Defs.' Ex. 2.) The grades that Coach Donahue said were necessary for eligibility were A's and B's in classes such as English and science— some of these would be replacement grades for C's and D's that Reggie earned previously in the same classes. (Defs.' Ex. 2.)

The 1996–1997 school year was the first time Reggie's guidance counselor, Mr. Murnan, ever had any involvement with NCAA eligibility issues. (Tr. at 137.) Mr. Murnan was a track coach and freshman guidance counselor, who had been unofficially providing guidance counseling to student athletes at St. Mel for years. (Tr. at 129, 136.) During Reggie's senior year, Mr. Murnan

---

**6.** Reggie took Microsoft Works in the first semester of his junior year (Fall 1995) and Microsoft Office in the first semester of his senior year (Fall 1996). (Defs.' Ex. 10.) He took St. Mel's required Scripture course in the second semester of his sophomore year (Spring 1995) and the required Ethics/Morality class in the second semester of his senior year (Spring 1997). (Defs.' Ex. 10.)

first became officially involved in the NCAA eligibility process. (Tr. at 136–37.) Apparently, a different St. Mel staff member was designated to handle NCAA forms each year. (Tr. at 138.) St. Mel did not have a procedure or centralized filing system to deal with all the required NCAA forms. (Tr. at 137–38.)

At some point (possibly around this time),[7] Ms. Hall sent in Reggie's Clearinghouse Student Release Form with a check for approximately $18, so that St. Mel would be authorized to send Reggie's transcript and ACT scores to the Clearinghouse, and so that the Clearinghouse could process that information in order to ascertain his eligibility under NCAA requirements. (Defs.' Ex. 24.) Ms. Hall testified that she understood that the check she sent in was a processing fee designed to defray the costs of clerical work necessary to process Reggie's form. (Tr. at 77.)

The Clearinghouse brochure, entitled "Making Sure You are Eligible to Participate in College Sports", directed student athletes to rely on their high school guidance counselors to make sure their core curriculum met NCAA requirements. (Defs.' Ex. 24.) Reggie did not fully understand the NCAA requirements for core courses and relied on what Mr. Murnan, and his "coaches" told him. (Tr. at 104.) Neither the NCAA nor St. Mel gave Mr. Murnan any training about how to deal with eligibility requirements. Moreover, prior to Reggie, the last St. Mel student recruited for college athletics was Lowell Hamilton, more than a decade earlier. (Tr. at 167.)

It is unclear exactly when St. Mel first sought to get NCAA approval for the two Microsoft computer classes at issue here.

However, back on May 7, 1996, the Clearinghouse sent St. Mel a Form 48–H [8] Confirmation, listing approved core courses.[9] (Defs.' Ex. 3.) The second page of that Confirmation discussed "non-core courses". (Defs.' Ex. 3.) Microsoft Office and Microsoft Works were specifically discussed on the second page as "changed definition" courses; they were deemed unacceptable if taken any time after the 1992–1993 academic year. (Defs.' Ex. 3.)

It appears that, by the fall of 1996, Bradley had determined that Reggie was deficient with regard to the initial eligibility index—i.e. his ACT/GPA combination. (Defs.' Ex. 9.) In September of 1996, Bradley began to work directly with St. Mel on Reggie's behalf; specifically, Bradley asked St. Mel to send over its Form 48–H Confirmation. (Defs.' Ex. 10.) The form that Bradley received listed, *inter alia*, Computer Science, Computer Science/Adv., and Programming as core courses.[10] (Defs.' Ex. 10.) However, that same form indicated that Microsoft Office and Microsoft Works were not acceptable core classes, if taken after the 1992–1993 academic year. (Defs.' Ex. 10.)

Mr. Murnan eventually determined, at some point in 1996, that the Microsoft Office and Microsoft Works courses had previously been submitted to the Clearinghouse as core courses and that they had been rejected. (Tr. 138.)

On October 17, 1996, the principal of St. Mel added his "corrections" to the Clearinghouse's May 7, 1996, Form 48–H Confirmation, seeking approval of the Microsoft Office and Microsoft Works courses (again—despite their previous denial) as core courses for the 1996–1997 academic year, as well as Scripture, Ethics/Morality,[11] and nine other

---

7. No copy of this form was proffered as evidence, nor was any date of submission testified to during the hearing.

8. The Form 48–H is a form used by a high school to identify proposed core courses. It is sent to the Clearinghouse for an ultimate decision.

9. Apparently the May 7, 1996 Form 48–H Confirmation had been sent to St. Mel in response to an earlier request for, *inter alia,* approval of Microsoft Office and Microsoft Works. (Defs.' Ex. 3.)

10. Although, in its August 29, 1997 appeal to the NCAA, Bradley stated that these computer courses were merely renamed as Microsoft Office and Microsoft Works, no evidence supporting that contention was presented. (Defs.' Ex. 10.)

11. This appears to have been the first time that the two religion classes were submitted to the Clearinghouse for consideration as core courses. (Tr. at 182; Defs.' Ex. 3.)

courses that Reggie had taken or was currently enrolled in, including Composition I.[12] (Defs.' Ex. 3.)

On November 5, 1996, Reggie was halfway through the first semester of his senior year. Coach Donahue wrote to Ms. Hall about Reggie's "updated situation," and said that *if* Reggie kept the quarter grades he had at that point *and* got (at least) B's in his last semester, he would still need a 79 sum [13] ACT score to be eligible.[14] (Defs.' Ex. 7.) Coach Donahue included the two Microsoft computer classes in his calculations. (Defs.' Ex. 7.)

Reggie made an early commitment to attend Bradley, in November of 1996. On November 19, 1996, the Halls signed a Bradley financial aid agreement which stated that "I understand that my failure to meet the scholastic requirements for athletic awards ... will render this agreement null and void." (Defs.' Ex. 6.)

In December of 1996, Bradley noticed that Reggie's Composition I class was not on the Form 48–H Confirmation. This is when Craig Dahlquist, Bradley's assistant athletic director for financial and compliance affairs, became involved with Reggie's NCAA certification. (Tr. at 176, 179–80.) At that time, he "kn[e]w that there was some concern over [Reggie] being eligible for the upcoming or the next school year...." (Tr. at 176.) Prior to that point, Bradley had been "actively involved in looking at [Reggie's] eligibility situation and assuring that proper courses were taken, studying grade point averages...." (Tr. at 176.) Bradley had also conveyed the potential core GPA problem to the Halls. (Tr. at 176–77.) Before Mr. Dahlquist's involvement, Bradley had

studied all the different possibilities from improving test scores to improving the grade point average through either retaking courses for better grades or taking different core courses which would apply, *investigating the possibility of getting some courses that had been denied by the NCAA Clearinghouse to an acceptable status so that those courses could be put on the 48–C form and evaluated appropriately.*

(Tr. at 177.) (emphasis added). However, once Mr. Dahlquist got involved, he knew that the two (disputed and previously rejected) Microsoft courses would be "key" to Reggie's eligibility.[15] (Tr. at 178.)

At that time, Mr. Dahlquist checked with the Clearinghouse and learned that the two Microsoft computer courses were still in a "changed definition status, which led us to believe that they had been submitted at least one time before and that in our opinion they needed to be submitted again...." (Tr. at 178.)

Eventually, Bradley requested that St. Mel send it a copy of the Form 48–H Confirmation. (Tr. at 179; Defs.' Ex. 3.) When it received the form, around late December 1996, Bradley became concerned about both Microsoft computer classes, as well as Composition I. (Tr. at 180; Defs.' Ex. 3.) Although the second page indicated to Bradley that the two computer courses "had been denied, were not acceptable courses, ... the fact that the Composition I class was not on there [at all] was a concern to us, and we directed our attention to that." (Tr. at 179–180.)

In a letter dated December 1996, the principal of St. Mel wrote to the Clearinghouse to request that Composition I, Microsoft Office,

---

**12.** Multiple Clearinghouse Confirmations may have been sent in response to this core class proposal and/or the courses at issue may have been reviewed by the Clearinghouse on numerous occasions. (Tr. at 245–46.)

**13.** The NCAA allows an applicant to combine test scores from more than one test date in order to calculate the highest possible ACT. The sum ACT score is calculated by adding together the top score achieved (during any of the tests) in each one of four different subject areas tested.

**14.** Reggie had just taken the ACT for the third time and was awaiting the results. From the previous two ACT's, Reggie's sum was only a 67. (Defs.' Ex. 10.)

**15.** The NCAA has suggested that, because Reggie was having difficulty getting the core GPA he needed, St. Mel and Bradley resubmitted the same courses that had already been rejected (but which Reggie did well in) in an effort to boost Reggie's core GPA in his top thirteen courses. (Tr. at 213.)

and Microsoft Works be accepted as core courses. (Defs.' Ex. 20.) Around this time, St. Mel may have attempted to submit syllabi, presumably for the two Microsoft classes, but did not receive any response from the Clearinghouse. (Defs.' Ex. 10.)

In January of 1997, Reggie began the second semester of his senior year. He was taking Ethics/Morality, a required religion course. (Defs.' Ex. 10.) Bradley asked St. Mel to drop Reggie from that class and place him in a confirmed core course. (Defs.' Ex. 10.) Ethics/Morality, however, was required for graduation from St. Mel. (Defs.' Ex. 10.)

On January 24, 1997, Bradley observed that Composition I had been added to the Form 48–H Confirmation as a core class, but that the two Microsoft classes had not been added.[16] (Defs.' Exs. 9, 21.) Apparently, on January 28, 1997, Bradley requested that St. Mel send descriptions of those two Microsoft classes to the Clearinghouse. Shortly thereafter, in early February 1997, the Clearinghouse informed Bradley that it required St. Mel to submit a "New Game Plan"[17] form— which was the newly required form for high schools to use in proposing core courses. (Defs.' Ex. 10.)

On February 17, 1997, Coach Donahue again wrote to make sure the Halls and Bradley "were on the same page". (Defs.' Ex. 8.) Coach Donahue outlined the grades Reggie had to get during his last semester *if* he raised his ACT to a 72 sum,[18] *and* assuming that the two Microsoft classes "which we haven't heard about yet" counted as core courses. (Defs.' Ex. 8.) Coach Donahue specifically noted that Reggie would need A's in Algebra I and Ecology, and B's in Composition I, English IV, Chemistry, and Trigonometry. (Defs.' Ex. 8.) Coach Donahue closed the letter with "Reggie, we are in your corner. You can do it." (Defs.' Ex. 8.)

On March 11, 1997, the Clearinghouse sent back another *Form 48–H Confirmation*, cov-

ering the 1996–1997 academic year. (Defs.' Ex. 13.) Included as approved on this form were many of the courses that St. Mel's principal sought to add as core on October 17, 1996. (Defs.' Ex. 13.) However, on the second page, under the heading "non-core courses", Ethics/Morality and Scripture were deemed unacceptable. (Defs.' Ex. 13.) Moreover, Microsoft Office and Microsoft Works were *again* deemed unacceptable if taken any time after the 1992–1993 academic year. (Defs.' Ex. 13.) Although Mr. Murnan (and St. Mel) could have appealed the Clearinghouse's determination that these classes were non-core, he did not do so. (Tr. at 159.)

The Halls have not established that anyone ever recommended that Reggie take Microsoft Works or Microsoft Office as core courses. As to the two religion courses required by St. Mel—Ethics/Morality and Scripture—there has been no showing that anyone ever recommended that Reggie take those as core courses either. (Tr. at 60.) No one ever told the Halls that any of those four courses had been approved as core courses by the NCAA. (Tr. at 60–61.) The Halls, however, may have been told, at some point after Reggie was enrolled or had taken the two computer courses, that they "had a good chance of going through" as core courses. (Tr. at 55.) Mr. Murnan had indicated to St. Mel's basketball coach, William Garrett, that the computer courses would qualify, but that he was not sure about the religion classes. (Tr. at 166–67.) Reggie seemed to be under the impression that the two Microsoft classes were required for graduation. "If I didn't have to take those classes to graduate, then I could be eligible now because I would have taken other classes. But it was a requirement of my high school that I had to take the computer classes and the religion classes to graduate out of high school." (Tr. at 120.) However, there was no evidence presented that the two computer classes were required. Rather, there was only evidence that the two

---

**16.** At that time, Bradley also noted that no official transcript had been received, and immediately requested that St. Mel send one to the Clearinghouse.

**17.** Apparently the New Game Plan went into effect in March of 1997. (Defs.' Ex. 10.) The New Game Plan forms may have been instituted

to further standardize the core course review process.

**18.** At that point, after taking the test three times, Reggie's sum ACT score was a 69. (Defs.' Ex. 10.)

religion classes at issue—Scripture and Ethics/Morality—were required for graduation from St. Mel.

Reggie took his fourth ACT in April of 1997 in order to see if he could get a higher score, "[j]ust in case".[19] (Tr. at 113–14.) On April 10, 1997, "New Game Plan" forms for Scripture, Ethics/Morality, Microsoft Office, and Microsoft Works were signed by St. Mel's principal and Mr. Murnan. These forms required answers to specific questions along with a percentage breakdown of the topics covered in the course.

For the Microsoft Office course, St. Mel indicated that it was not considered a college preparatory course.[20] (Defs.' Ex. 16.) Further, the percentages of time spent on "Spreadsheets", "Networking", or "Programming" was zero. Instead, St. Mel indicated that 30% of the course would be spent on "Computer Literacy", 30% on "Databases", 20% on "Word Processing", and 20% on "Other". (Defs.' Ex. 16.) For Microsoft Works, St. Mel indicated that "Computer Literacy" would take up 50% of the course, "Databases" would be 25%, and "Spreadsheets" would be 25%. (Defs.' Ex. 16.) Inexplicably, next to "Have you previously submitted information about this course ... and been informed that it was not accepted as a core course?", St. Mel checked off "NO" for both computer classes (as well as both religion classes)! (Defs.' Ex. 16.) Microsoft Office and Microsoft Works were denied acceptance as core courses, under the New Game Plan, on May 9, 1997. (Defs.' Ex. 16.)

Reggie graduated from St. Mel on June 1, 1997. Around June 6, 1997, someone from the NCAA spoke with Mr. Murnan and requested syllabi for the two religion classes.[21] (Defs.' Ex. 16.)

At the time of his graduation, Reggie had taken over thirteen "core courses", and had a core GPA of 2.346. (Defs.' Ex. 9.) However, because his sum ACT score was 70, the corresponding required minimum core GPA was 2.425. (Defs.' Ex. 9.) Thus, Reggie

failed to satisfy the minimum eligibility requirements, with respect to his core GPA, and, on June 24, 1997, was determined to be a "nonqualifier". The Clearinghouse's determination that Reggie is a "nonqualifier" means that he is ineligible to practice with, or compete on behalf of, Bradley's men's basketball team. He is also not allowed to receive any part of his full athletic scholarship.

Although the Clearinghouse, at times, may have applied inconsistent levels of review to the myriad of proposed core courses received from high schools, (Pls.' Ex. 1), there has been no showing that this was due to racial animus or that it even had any discriminatory effect. Furthermore, there has been no evidence presented that identical classes (from different high schools) received disparate decisions with regard to whether or not they were core courses.

## VI. *NCAA Appeals Process*

On July 30, 1997, Bradley applied to the NCAA for a waiver of initial academic eligibility requirements, (Defs' Ex. 9), despite Mr. Dahlquist's opinion that "it was going to be a difficult case to put through...." (Tr. at 189.) The NCAA grants GPA deficit waivers, even for extenuating circumstances directly linked to the student getting poor grades (such as a death in the family causing a notable and significant drop in grades for a semester or so), only about 10% of the time. (Tr. at 211.) Waivers, like the one sought here, where there is no extenuating circumstance linked to the student athlete's failure to meet the GPA requirement (for example, someone who was merely a marginal student and came close but did not reach the requirement) occur "zero" percent of the time. (Tr. at 211–12.) Thus, waivers are only granted where unusual circumstances occurred causing a student to fall short of the requirements. (Tr. at 212.) Reggie's waiver was denied sometime in August of 1997. Mr. Dahlquist did not think that the NCAA's

---

**19.** His final sum ACT was 70. (Defs.' Ex. 9.)

**20.** Mr. Murnan admitted that, even today, he has no idea whether Microsoft Office is a core course or meets the NCAA requirement. (Tr. at 142.)

**21.** A decision denying Scripture and Ethics/Morality as core courses was sent on July 17, 1997. (Defs.' Ex. 16.)

decision to deny the waiver was "inappropriate". (Tr. at 190.)

Bradley submitted an appeal of the denial of waiver, on August 29, 1997. (Defs.' Ex. 10.) Mr. Dahlquist was "very surprised to find out that the NCAA was willing to look again at the case, since administratively [he] felt that [they] had exhausted every possibility at the cabinet level. . . ." (Tr. at 191.) This unusual appeal was conducted in order to accommodate the Halls and Bradley. (Tr. at 192.) The appeal focused on the denial of the two Microsoft classes as core courses and the computation of Reggie's core GPA (with respect to the grade scale used and the use of semester/yearly grades). As discussed previously, the Clearinghouse's denial of core status to the two Microsoft courses was consistent with its standards governing core computer science courses.

The grading scale used (by the Clearinghouse) to calculate Reggie's core GPA was standard. It was the same grading scale used at St. Mel. Instead of 90–100 being an A, 80–90 being a B, and so forth, the standard at St. Mel was 97–100 for an A+,[22] 93–96 for an A, 89–92 for a B+, 84–88 for a B, and so on. (Tr. at 166.) St. Mel had many opportunities—on every Form 48–H submitted, in fact—to state that its grade scale was not standard; but St. Mel never did. (Defs.' Exs. 13–15; Tr. 218–19.) Moreover, approximately 3,000 high schools registered with the Clearinghouse use the 100–90–80 grading scale, while almost the same number use a grading scale similar to St. Mel's. (Tr. at 207–208.) Finally, the grading scale at St. Mel is the grading scale that the Clearinghouse applies (by default) when a high school has no grading scale.[23] (Tr. at 208.)

The Halls base their argument, for recalculation with a different grade scale, on a recent case reported in the June 2, 1997 "NCAA Register". (Defs.' Ex. 10.) In that case, the NCAA approved the appeal of a student athlete who failed to achieve the GPA that corresponded with his ACT score. The high school, in that case, offered four levels of courses: level one courses (honors and advanced placement) which received 20% above GPA; level two courses (accelerated/advanced courses) which received 10% above GPA; level three courses (accelerated/advanced courses) which received 5% above GPA; and level four courses (basic curriculum) which received nothing above GPA. (Defs.' Ex. 10.) The Clearinghouse had only given the student credit for level one courses, so his GPA fell short. Once the weighting system was properly verified by the high school, the NCAA recalculated the student's GPA—which then rose above the required minimum.

The situation in that case is distinct from Reggie's because it concerned the correct *weighing* of classes, instead of use of a particular grading scale. (Tr. at 202–203, 207.) Moreover, NCAA bylaw 14.3.1.3.5, allows for high schools that weigh honors classes differently. (Tr. at 205–207; Defs.' Ex. 22.)

Also, during its appeal, Bradley sought to have the NCAA recalculate Reggie's core GPA using quarter grades instead of semester grades.[24] (Tr. at 191.) This idea was also based upon another case in the June 2, 1997 "NCAA Register". (Defs.' Ex. 10.) In that case, a student's GPA, when calculated

---

**22.** St. Mel gave pluses, but not minuses. The NCAA bylaws state that pluses and minuses shall not receive greater or lesser weight. (Defs.' Ex. 22.)

**23.** During the October 31, 1997 hearing, the Halls also advanced the argument that St. Mel's grading scale is non-standard because the school uses a 4.5 point scale instead of the standard 4.0 scale. (Pls.' Post–Hearing Mem. at 5.) However, this fact is completely irrelevant to the calculation of Reggie's core course GPA, which was based on his letter grades and not on his point scale GPA. Moreover, Reggie's non-standard 4.5 scale GPA would have to be reduced when converted to a standard 4.0 scale GPA. For exam-

ple, a student with a 4.0 GPA on the 4.5 scale has a 3.56 GPA on the 4.0 scale.

**24.** Bradley proposed calculation of Reggie's core GPA by selectively using his best quarter grades instead of the semester grades printed on his transcript, for certain classes. Under this mixed-quarter grade calculation, the good quarter grades received in a course would be used in the core calculation while less advantageous quarter grades would be excluded. For example, in Reggie's senior year, Functions, Statistics, and Trigonometry class, he received quarter grades of C, C, B+, and A: Bradley proposed using only the A in calculating Reggie's core GPA.

based on yearly grades, fell short of the required minimum. However, the NCAA allowed a recalculation based on *semester* grades, since her high school graded on a semesterly basis.

Here, the suggested recalculation, which *mixed* quarter and semester grades, was against NCAA bylaws (which required either semester or yearly grades only, and did not entertain use of quarter grades). (Defs.' Ex. 23; Tr. at 215–16.) Further, even if the NCAA had allowed this hodge podge of semester and quarter grades to be used in calculating Reggie's GPA, the testimony is undisputed that it still would have failed to produce a high enough core GPA. (Tr. at 215–16.) Nor would quarter grades *alone* have done the trick. (Tr. at 215.)

Kevin Lennon, director of membership services at the NCAA, served as staff liaison with the subcommittee of the cabinet that heard Reggie's appeal. (Tr. at 252.) That subcommittee was made up of four faculty members from member institutions and one athletic administrator. (Tr. at 252.) Mr. Lennon testified that Reggie received a full and fair hearing. (Tr. at 252.) On September 2, 1997, Bradley's appeal, on Reggie's behalf, was rejected.

In sum, the Halls have not shown that the Clearinghouse or NCAA applied different standards with regard to grading scales or waivers to applicants of different races, or that the denial of a waiver in Reggie's case was done in bad faith.[25]

## VII. *Financial Issues*

Ms. Hall paid tuition for Reggie to attend St. Mel. Ms. Hall earned almost $61,000 last year and will make approximately $55,000 this year. (Tr. at 67, 81; Defs.' Ex. 4.) Reggie is her only dependent. (Tr. at 80.) Recently, she co-signed (with Reggie) a loan for $7,000, in order to pay his first semester's tuition at Bradley. Reggie also signed a direct student loan form, on Sept. 22, 1997, for $4,000. (Defs.' Ex. 5.)

25. Plaintiffs' Exhibit 2 (NCAA Academic Study 91–01) was never returned to the Court, and,

The Halls have failed to prove that they will be unable to pay future semesters' tuition. Reggie has already applied for and received at least one direct student loan. It is reasonable to assume that such loans will be available to him for future semesters. In fact, in this era of escalating college tuitions, the Court takes judicial notice that student loans are the common means of financing a college education. In any event, the Halls have failed to show that student loans or other forms of financing would be unavailable to them, if necessary. Moreover, they have failed to even establish that their other expenses, when combined with tuition costs, would exceed Ms. Halls' income.

### CONCLUSIONS OF LAW

#### I. *Preliminary Injunction Standard*

To prevail on a motion for a preliminary injunction, the movant must initially clear a threshold requirement by showing that: (1) the case has a reasonable likelihood of success on the merits; and (2) there exists no adequate remedy at law and the movant will suffer irreparable harm if the preliminary injunction is not granted. *Mil–Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir.1996); *see also Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313–14 (7th Cir.1994). If these conditions are met, the initial threshold has been cleared and the court must next: (3) balance the irreparable harm to the movant if the injunction is denied, against the harm to the non-movant if it is issued improvidently; and (4) after weighing the interests of the parties, additionally consider the public interest (*i.e.*, non-parties) consequences of either a grant or denial of the injunction. *Mil–Mar*, 75 F.3d at 1156; *see also Storck*, 14 F.3d at 314.

#### II. *Application*

##### A. Likelihood of Success on the Merits

In determining the likelihood of success on the merits, the court must at least find that the petitioner's chances are "better than negligible." *Kinney v. International Union of*

therefore, was not considered. (Tr. at 266–67.)

*Operating Eng'rs, Local 150*, 994 F.2d 1271, 1278 (7th Cir.1993).

### 1. *Count I—Breach of Contract*

■ In Count I of their Complaint, the Halls allege that the NCAA, through the Clearinghouse, entered into a contract with Reggie when Ms. Hall sent in a Clearinghouse Student Release Form (referred to in the Complaint as an initial eligibility application) to the Clearinghouse with a check for approximately $18. (Compl. ¶ 48.) Although the Court was not provided with a copy of the application, it appears likely that some type of contract between the Halls and the Clearinghouse was formed with this transaction.[26] The Halls analogize the Clearinghouse's implied contractual duties to those of a college evaluating a student for award of a degree. In *Johnson v. Lincoln Christian College*, 150 Ill.App.3d 733, 103 Ill.Dec. 842, 501 N.E.2d 1380 (1986), a student's application for admission was found to be an offer, and the college's admission of the student was found to constitute acceptance of the offer.[27] *Id.*, 103 Ill.Dec. at 846, 501 N.E.2d at 1384. Similarly, the application and fee here appears to have constituted an offer by Reggie for the Clearinghouse to process and then evaluate his application under NCAA eligibility standards, an offer which the Clearinghouse appears to have accepted.[28]

#### a. *Good Faith and Fair Dealing*

■ Every contract contains an implied covenant of good faith and fair dealing.

*First Nat'l Bank of Cicero v. Sylvester*, 196 Ill.App.3d 902, 144 Ill.Dec. 24, 554 N.E.2d 1063 (1990). Issues involving the obligation of good faith and fair dealing usually arise when one party to a contract is given broad discretion in performance. *Northern Trust Co. v. VIII S. Michigan Assocs.*, 276 Ill. App.3d 355, 212 Ill.Dec. 750, 759, 657 N.E.2d 1095, 1104 (1995). The covenant of good faith requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily or capriciously. *Id.* Thus, in *Johnson*, because of the contract, the college was precluded from arbitrarily, capriciously, or in bad faith, refusing to award a degree to the student who had admittedly met all the college's degree requirements.

■ Similarly, because of the apparent contract between Reggie and the Clearinghouse, the Clearinghouse (and ultimately the NCAA) could not arbitrarily, capriciously, or in bad faith refuse to find Reggie eligible if he indeed clearly met the NCAA's initial eligibility requirements. However, as this Court has already discussed in its Findings of Fact, Reggie did not meet those requirements. Thus, the determination that Reggie was ineligible was not arbitrary, capricious, or otherwise made in bad faith.

#### b. *Core Course Requirements*

■ The Halls contend that the NCAA acted in bad faith by failing to include certain of Reggie's courses in the calculation of the

---

**26.** As discussed earlier, since the application was not submitted, this Court is unable to ascertain the timeliness of Clearinghouse's response to this application. Also, the Court is unclear as to when the Clearinghouse received any and all necessary information to process the application (as noted in the Findings of Fact, Reggie's transcript was not sent by St. Mel until after January of 1997). Additionally, the Court cannot discern any of the specific terms of the "contract" here, since, the document has not been provided.

**27.** The Court notes that *Johnson's* applicability here is tenuous. The fee that Ms. Hall sent in might merely have covered the processing of Reggie's information and application. In that event, the only lawsuit they could bring for breach of contract would be in the event that the Clearinghouse had not processed the information, but cashed the check anyway.

Moreover, there was absolutely no question, in *Johnson*, that the plaintiff fulfilled *all of the academic requirements* during his five year course of study, but was denied his diploma simply on the grounds that he was homosexual.

**28.** The Halls rely on *Phillip v. Fairfield Univ.*, 118 F.3d 131 (2d Cir.1997) in arguing that there was a contract between Reggie and the NCAA. While the district court made such a finding in *Phillip*, the Second Circuit did not express an opinion on whether the NCAA owed any contractual duties to the player. *Id.* at 135. However, it appears that the *Phillip* court focused on whether contractual duties toward the student arose out of the contract between the NCAA and the university, but did not focus on the application fee paid by the student to the NCAA. *Id.*

core course GPA. Specifically, they argue that Microsoft Office, Microsoft Works, Scripture, and Ethics/Morality were excluded arbitrarily, capriciously and/or otherwise in bad faith. However, this Court has already found that those classes did not fulfill the NCAA's requirements for core courses.

The NCAA requires that core religion courses be non-doctrinal; that is, they must explore various belief systems rather than teaching a particular religious point of view. The course syllabi for Scripture and Ethics/Morality demonstrate that these two (which were required for graduation from St. Mel—a private, Catholic high school) were based on a Christian ideology. This Court has found that the Clearinghouse and NCAA were correct in denying core status to Scripture and Ethics/Morality, and that such denial was not done in bad faith.

Likewise, since 1993, the NCAA has had a standard for determining whether computer classes are core. No more than 25% of the course instruction may include keyboarding or word processing, and the remaining instruction must concern specific subjects such as programming and networking. However, review of the syllabus for Microsoft Office demonstrates that 50% of the class clearly involved keyboarding and word processing skills. Likewise, the Microsoft Works class contained excessive keyboarding and word processing, and failed to include the other necessary instruction components. Again, this Court has found that the Clearinghouse and NCAA were correct in denying core status to both of these Microsoft computer courses, and that such denial was not done in bad faith.

Thus, the Halls' claims relating to the four courses—Microsoft Works, Microsoft Office, Scripture, and Ethics/Morality do not have a reasonable, or even negligible chance of success.

### c. Non–Standard Grading Scales

■ The Halls contend that the Clearinghouse and NCAA acted in bad faith by failing to take into account St. Mel's "non-standard"

grading system. The Halls allege that a given percentage score equates to a lower letter grade at St. Mel than it does at other schools. For example, an 82% score at St. Mel earns a C whereas, the Halls allege, it would earn a B at other schools. (Compl. ¶ 33.) Even if it were true that St. Mel's grading scale is harsh, the NCAA has a policy that a student's percentage grades are evaluated only with reference to the grading scale of the school he attended.[29] Thus, the application of St. Mel's grading scale to Reggie's percentage scores was not arbitrary, capricious, or in bad faith. Moreover, it does not follow from the fact that St. Mel has a higher grading scale, that the school actually gives out fewer good grades than other schools. The Halls have not disproved the likely explanation that teachers at St. Mel take the grading scale into account when evaluating assignments, and give out the same number of A's, B's, and C's as they would if teaching at another school.

This Court has found, based on the evidence presented, that the grading scale used to calculate Reggie's core GPA was standard. Thus, neither of the Halls' claims of unfair grade scale application have a better than negligible chance of success.

### 2. Count II—Negligent Misrepresentation

■ In Count II of their Complaint, the Halls allege that the NCAA made negligent misrepresentations. (Compl., Count II, ¶¶ 53–58.) To succeed on a negligent misrepresentation claim, the Halls must show: (1) a false statement of material fact by the NCAA; (2) carelessness or negligence in ascertaining the truth of the false statement; (3) intention to induce the Halls to act; (4) reliance by the Halls on the truth of the statement; (5) damage to the Halls resulting from such reliance; and (6) a duty owed by the NCAA to the Halls to communicate accurate information. *Lockwood v. Standard & Poor's Corp.*, 289 Ill.App.3d 194, 224 Ill.Dec. 570, 573, 682 N.E.2d 131, 134 (1997). The Halls have failed to make the requisite showing.

---

**29.** This is true unless the high school provides percentage grades but fails to provide a grading scale, in which case a default grading scale similar to St. Mel's is used.

Initially, the Halls have not identified the false material facts that the NCAA allegedly provided to them. Instead they only make the vague and conclusory allegation that "NCAA and the Clearinghouse negligently supplied false and misleading information for the guidance of Reginale in his efforts to become eligible to receive his scholarship...." (Compl. ¶ 55.) In the absence of a false statement of material fact by the NCAA, the Halls cannot succeed on this claim.[30] Thus, the Halls' negligent misrepresentation claim has no better than a negligible chance of success.

### 3. Count III—Promissory Estoppel

▪ The Halls next seek relief under a promissory estoppel theory. Promissory estoppel requires: (1) an unambiguous promise by the NCAA to the Halls; (2) reliance on that promise by the Halls; (3) that the Halls' reliance was expected and foreseeable to the NCAA; and (4) that the Halls actually relied on the promise to their detriment. *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (Ill.1990).

▪ The Halls allege that the first element is met because the NCAA promised that it would provide accurate information on how Reggie could achieve eligibility, and would provide information concerning Reggie's eligibility. (Compl. ¶¶ 60–61.) Since the Halls have not identified the source of this promise, the alleged promise is rather ambiguous. On cross examination, Ms. Hall admitted that she had never seen the document containing the NCAA constitution, bylaws, and rules. (Tr. at 71–72.) Thus, these documents could not be the source of the promise. It is not clear how the NCAA promised to provide information to the Halls.

Further, implicit within the doctrine of promissory estoppel is the requirement that the promise was unfulfilled. The Halls have not shown how the NCAA broke its alleged promise. Nowhere have the Halls shown

that the NCAA provided them with false or misleading information, nor have they demonstrated the NCAA's unwillingness or failure to provide information about Reggie's eligibility. Yet, the Halls seem to argue that they were misled into believing that Reggie's Microsoft Works, Microsoft Office, Scripture, and Ethics/Morality courses would be counted as core courses.

Finally, even if, *arguendo,* the Clearinghouse or NCAA had provided information to the Halls indicating that the courses in question would be accepted as core courses,[31] the Halls did not rely to their detriment on any such promise. To the contrary, the attempt to get the two Microsoft computer and two religion classes counted as core courses was a scheme developed by Bradley in late 1996, *after* it became apparent that Reggie would not achieve the GPA/ACT targets required under the original plan. *See supra* n. 15. Thus, there was no reliance on any information provided by the NCAA with respect to core course requirements, and the Halls' promissory estoppel claim has no greater than a negligible chance of success.

### 4. Count IV—Third–Party Beneficiary

The Halls' third-party beneficiary claim alleges that Reggie was injured as a result of the bilateral breach of a contract between the NCAA and Bradley. Though not obvious from the Halls' Complaint, the contract relevant to this claim appears to be the NCAA's constitution, bylaws, and regulations. To succeed on a third-party beneficiary claim, the Halls must show that they were intended, and not merely incidental, beneficiaries to the contract between the NCAA and Bradley. *Federal Ins. Co. v. Turner Const. Co.,* 277 Ill.App.3d 262, 213 Ill.Dec. 870, 875, 660 N.E.2d 127, 132 (Ill.App.Ct.1995).

▪ There can be no doubt that an important function of the NCAA and its constitution, bylaws, and regulations, is to benefit student athletes. It is not clear, however,

---

30. It appears as though the Halls have abandoned this claim as their Post–Hearing Memorandum contains no mention of negligent misrepresentation.

31. In fact, this Court has already found that no one ever told the Halls that any of those four courses had been approved as core courses. Therefore, this proposition is merely included for the sake of argument.

that this fact is sufficient to elevate a student from an incidental to an intended beneficiary. Contracting parties are presumed to enter contracts only for their own benefit, a presumption which can be overcome only by identifying the third-party beneficiary in the contract. *Turner*, 213 Ill.Dec. at 875, 660 N.E.2d at 132.

In *Hairston v. Pacific 10 Conference*, the Ninth Circuit affirmed the district court's determination that it could not be inferred from the "'vague, hortatory pronouncements'" of the "Pac-10's" constitution, which proclaimed the conference's mission to include many goals benefitting student athletes, that the conference "'intended to assume a direct contractual obligation to every football player on a Pac-10 team.'" 101 F.3d 1315, 1320 (9th Cir.1996) (quoting *Hairston v. Pacific-10 Conference*, 893 F.Supp. 1485, 1494 (W.D.Wash.1994)). The situation at bar, however is somewhat distinguishable from the *Hairston* case, because the NCAA, and Clearinghouse, specifically determine the eligibility of every student athlete who wants to participate. Contrastingly, the "Pac-10" does not occupy the same type of "gatekeeper" position; the "Pac-10" does not disqualify students from intercollegiate athletics. In fact, the Court takes judicial notice that the "Pac-10", (like other athletic "conference" members—including Bradley) is governed by the NCAA's eligibility requirements.

For purposes of this Memorandum Opinion and Order, the Court will assume that the Halls have some likelihood of success in proving that student athletes are third-party beneficiaries to the contract among the NCAA and all its members.[32] However, the Halls still have not established any breach of contract.

■ In order to establish a breach of contract the Halls must show that the Defen-

dants failed to perform a material obligation under the contract. As discussed in the Findings of Fact, and again with respect to Count I, the four courses at issue simply did not satisfy the NCAA requirements necessary to count as core courses. Further, Reggie's GPA was calculated using a standard grading scale, and under that scale it just did not measure up. There was no breach of the implied covenant of good faith and fair dealing here.[33] In fact, there was no breach at all. Defendants actually fulfilled their contractual obligations by determining Reggie to be ineligible: they did exactly what they agreed to by not allowing a student to play intercollegiate sports where he failed to meet the NCAA's criteria. Thus, the Halls' third-party beneficiary/breach claim has no more than a negligible chance of success.

5. *Count V—Tortious Interference with Advantageous Contractual Relationship*

■ In Count V of their Complaint, the Halls allege that, in denying initial eligibility to Reggie, the NCAA intended to interfere with the scholarship contract between Reggie and Bradley. To prevail on this claim the Halls must establish: (1) the existence of a valid and enforceable contract between themselves and Bradley; (2) the NCAA's awareness of the contract; (3) the NCAA's intentional and unjustified inducement of breach of contract; (4) a subsequent breach by Bradley, caused by the NCAA's wrongful conduct; and (5) damages resulting from the breach. *Wheel Masters, Inc. v. Jiffy Metal Products Co.*, 955 F.2d 1126, 1129 (7th Cir. 1992) (applying Illinois law).

The first element is established by the scholarship contract between Reggie and Bradley. (Defs.' Ex. 6.) Likewise, the NCAA knew that Reggie was slated to at-

---

**32.** NCAA members, pursuant to the constitution, bylaws and regulations, all agree that students will not be allowed to play intercollegiate sports unless they meet NCAA criteria. Further, the member institutions agree to let the NCAA set the criteria, and to abide by the NCAA's final eligibility decision. As the Findings of Fact note, the intent of the NCAA and its members in evaluating incoming student athletes, and excluding those who do not meet the requirements, is to specifically protect entering student athletes by

assuring that they have high prospects for graduating.

**33.** Finally, to the extent that discretion was involved in the denial of a waiver for Reggie, it was used in good faith and not arbitrarily or capriciously. Waivers are limited to GPA deficits linked to extenuating circumstances, of which there are none here.

tend Bradley on an athletic scholarship. While the NCAA intended that its denial of Reggie's initial eligibility would prevent Bradley from extending an athletic scholarship to Reggie, the NCAA's action did not cause a breach of Reggie's contract with Bradley. In fact, the Halls do not allege that Bradley breached the athletic scholarship contract, likely because the contract unambiguously stated that the agreement would be null and void if Reggie failed "to meet the scholastic requirements for athletic awards...." (Defs.' Ex. 6.)

Since the contract specifically contemplated application of external scholastic standards to Reggie's high school academic record, and since Reggie was aware of the NCAA's initial eligibility requirements, it cannot be said that the NCAA's involvement was unjustified. The Halls invited the NCAA into the transaction by submitting an initial eligibility application. Because Bradley did not breach its contract with Reggie, and because the NCAA's involvement was not unjustified, the Halls' tortious interference claim has no better than a negligible chance of success.

### 6. Count VI—Breach of Implied Covenant of Good Faith and Fair Dealing

■ Apart from their breach of contract claim(s), the Halls added a claim that the NCAA breached the duty of good faith and fair dealing resulting from express or implied contracts between it and Reggie. However, Illinois does not recognize a breach of good faith and fair dealing cause of action, apart from a breach of contract claim. *Cobb–Alvarez v. Union Pac. Corp.*, 962 F.Supp. 1049, 1054 (N.D.Ill.1997). This Court has addressed the allegations with respect to breach of the implied covenant of good faith and fair dealing in the corresponding breach of contract sections. Thus, for the same reasons discussed in Counts I and IV, this claim has no more than a negligible chance of success.

### 7. Count VII—Violation of Civil Rights Act of 1866

The Halls raise a number of rather confusing racial discrimination claims; the first is that the NCAA violated the Civil Rights Act of 1866. 42 U.S.C. §§ 1981–82 (1994). Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

42 U.S.C. § 1981.

■ Similarly, § 1982 provides that "[a]ll citizens of the United States shall have the same right ... as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. These somewhat dated statutory passages were enacted to implement the Thirteenth Amendment by counteracting the often blatantly discriminatory statutes which existed in some states after the Civil War. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 387–88, 102 S.Ct. 3141, 3148–49, 73 L.Ed.2d 835 (1982). Further, the Civil Rights Act of 1866 served as a forerunner to the Fourteenth Amendment. *Id.* Given their place in history, it is not surprising that § 1981 and § 1982 have been unambiguously interpreted to require purposeful discrimination, and not disparate impact, in order to support a claim. *Id.* at 391, 102 S.Ct. at 3150. In fact, an important distinction between the Civil Rights Act of 1866 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1994), is that Title VII allows for disparate impact claims. *Mozee v. American Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir.1991). There is no doubt that the NCAA's initial eligibility requirements in question are indeed facially neutral, and there is no evidence of purposeful discrimination.[34]

---

**34.** The Halls' allegations that the NCAA standards have a disparate impact on African–Americans are misplaced. Moreover, there is no evidence before the Court that the NCAA standards result in African–Americans being denied basketball scholarships more often than similarly situated Caucasians.

The Halls have failed to allege intentional discrimination of the type that would support a § 1981 or § 1982 claim, and have provided no evidence of such discrimination. Therefore, the Halls have no more than a negligible chance of success with respect to these.

### 8. *Count VIII—42 U.S.C. § 1983*

In Count VIII, the Halls allege that Reggie's constitutional right to equal protection was denied because the NCAA failed to adequately respond to its studies showing that, in some situations, African–Americans graduate at higher rates than whites with identical SAT scores. A statutory remedy for equal protection violations is provided by 42 U.S.C. § 1983. Section 1983 affords redress for those whose equal protection rights are violated " 'under color of state law,' " by persons " 'who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.' " *NCAA v. Tarkanian*, 488 U.S. 179, 190, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988) (quoting *Monroe v. Pape*, 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961)). On the other hand, the Equal Protection Clause provides no protection against "private conduct abridging individual rights." *Id.* (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)). Thus, to prevail on their § 1983 claim, the Halls must show that the NCAA was a state actor. In addition, they must show that the NCAA deprived them of a liberty or property right.

The Supreme Court has held that the NCAA is not a state actor, for purposes of a § 1983 claim. *Id.* at 199, 109 S.Ct. at 465–66; *see also Hawkins v. NCAA*, 652 F.Supp. 602, 606–07 (C.D.Ill.1987). *Tarkanian* involved the claims of Jerry Tarkanian, the former head basketball coach of the University of Nevada, Las Vegas ("UNLV"). Coach Tarkanian alleged that his suspension for breaking NCAA rules deprived him of equal protection, in violation of the Fourteenth Amendment and § 1983. *Id.* at 181, 109 S.Ct. at 456–57. UNLV, a public university and member of the NCAA, was found to be a state actor. *Id.* at 193, 109 S.Ct. at 462–63. After considering, *inter alia*, UNLV's participation in the promulgation of NCAA rules, UNLV's enforcement of NCAA rules, and the NCAA's expansive power over college athletics, the Court still concluded that the NCAA was not a state actor. If the NCAA's relationship with UNLV, a public university, was insufficient to translate the NCAA's actions into state action, then the NCAA is clearly not a state actor by virtue of its relationship with Bradley, a private university. Since the NCAA is not a state actor, it is not subject to constitutional restraints and cannot be sued under § 1983 for alleged equal protection violations.

Moreover, even assuming, *arguendo*, that the NCAA is a state actor, the Halls have failed to make the requisite showing that they were deprived of a property or liberty interest by the NCAA. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Though the Halls do not specify what property or liberty interest was violated by the NCAA, "there is no property or liberty interest in participating in interscholastic athletics." *Hawkins*, 652 F.Supp. at 610. Likewise, "hoped for careers in basketball" are too speculative to comprise a constitutionally protected property right under *Roth*. *Parish v. NCAA*, 506 F.2d 1028, 1034 n. 17 (5th Cir.1975), *rev'd on other grounds*, *McCormack v. NCAA*, 845 F.2d 1338 (5th Cir.1988). "While participation in intercollegiate basketball has been recognized as a training ground for a professional basketball career, the possibility of obtaining that professional basketball career is too speculative to even constitute a present economic interest." *Knapp v. Northwestern Univ.*, No. 95 C 6454, 1996 WL 495559, at *2 (N.D.Ill. Aug.28, 1996), *rev'd on other grounds*, 101 F.3d 473 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997). Finally, there is no protected economic interest in an athletic scholarship because, "[w]hile a college degree enhances one's ability to earn a livelihood, the lack of a scholarship does not prohibit a person from pursuing a college degree." *Id.*

Therefore, although the Halls may feel a need or a desire for Reggie to play basketball at Bradley under an athletic scholarship, their interest does not rise to the level of a constitutionally protected right. Furthermore, since the Halls are unable to show that the NCAA is even a state actor, and cannot demonstrate a constitutionally protected property interest, their § 1983 claim has no more than a negligible chance of success.

### 9. Count IX—42 U.S.C. § 2000a

Finally, the Halls allege that the NCAA violated Title II of the Civil Rights Act of 1964. 42 U.S.C. § 2000a (1994). Title II prohibits discrimination in the provision of places of public accommodation. *Id.* However, federal subject matter jurisdiction depends on the plaintiff's compliance with the notice provisions of Title II:

> In the case of an alleged act or practice prohibited by this subchapter which occurs in a State or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) of this section before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority....

42 U.S.C. § 2000a–3(c).

■ The Illinois Human Rights Act prohibits racial discrimination in places of public accommodation. 775 ILL.COMP.STAT. 5/1–102(A) (1993). Thus, where an Illinois plaintiff fails to comply with 42 U.S.C. § 2000a–3(c) by failing to notify the Illinois Department of Human Rights of his complaint, the federal courts are without subject matter jurisdiction. *Stearnes v. Baur's Opera House,* 3 F.3d 1142, 1145 (7th Cir.1993). The Halls have provided no evidence that they filed a complaint with the Illinois Department of Human Rights. Thus, this Court is without subject matter jurisdiction, with respect to the Title II claim, meaning that the Halls have no more than a negligible chance of success with respect to their Title II claim.

### 10. Conclusion as to the Likelihood of Success

In sum, Plaintiffs have no more than a negligible chance of success on the merits with regard to *any* of the nine counts in their Complaint. Thus, the preliminary injunction must be denied. Further, even if, *arguendo,* the Halls were assumed to have a somewhat greater than negligible chance of success on one or more of their claims, the injunction must still be denied because of their failure to meet the other requirements for the granting of such relief.

### B. Lack of an Adequate Remedy at Law, and Irreparable Harm

■ The Halls must show that there is no adequate remedy at law and that they will be irreparably harmed. The lack of an adequate remedy at law ordinarily means that money damages would not suffice. *American Medicorp, Inc. v. Continental Ill. Nat'l Bank and Trust Co.,* 475 F.Supp. 5, 7 (N.D.Ill.1977). Although, if the Halls were to eventually prevail on the merits of the underlying case, yet were denied this preliminary injunction, Reggie might suffer a harm that is difficult to translate into money damages, that harm is not irreparable. Specifically, Reggie, might miss out on a season of practice and interscholastic competition with the Bradley men's basketball team. Reggie credibly testified that the skills he needs to develop in order to become an effective part of the basketball team require that he participate in games and practices. The Halls claim that, without this preliminary injunction, "Reggie w[ill] be denied the opportunity to play major college basketball and pursue his dream of becoming a professional basketball player." (Pls.' Post–Hearing Mem. at 7–8.) However, the Halls presented no evidence that a one season delay will extinguish Reggie's college (and hopeful professional) career, thereby irreparably harming him. In fact, the Court takes judicial notice that numerous basketball players have gone on to stardom in the NBA and other professional leagues despite having missed the first season with their college basketball teams. Thus, while sitting out a year might inconvenience Reggie, he has not shown that such

inconvenience would cause harm that would be irreparable.

The Halls also argue that irreparable harm would result if the preliminary injunction is denied here because they lack the resources to keep Reggie in school without an athletic scholarship. However, they have failed to demonstrate that all options for paying for Reggie's school have truly been exhausted. The Halls were able to obtain loans for Reggie's fall semester, and provided no evidence that those lenders are unwilling to fund loans for the spring semester as well. Moreover, Ms. Hall earns approximately $61,000 per year and has only one dependent, Reggie. Ms. Hall did not testify to any unique financial burdens or responsibilities. In short, funding or financing one year of college education hardly seems an insurmountable burden for the Halls. Moreover, the lost scholarship funds and interest would be reducible to a monetary damage award in the event that the Halls prevailed on any of their claims. Thus, the Court finds that the denial of Reggie's athletic scholarship does not constitute irreparable harm.

### C. Balance of Harms

Even if, *arguendo*, the Court found more than a negligible chance of success on the merits of any claim (and irreparable harm coupled with no adequate remedy at law), the balance of harms tips in favor of Defendants. The balancing of harms involves a "sliding scale" analysis wherein "the greater the movant's chance of success on the merits, the less strong a showing it must make that the balance of harms is in its favor." *Storck*, 14 F.3d at 314.

In comparing the harm to the Halls, if Defendants are not enjoined, with the harm to Defendants if they are enjoined and Reggie is permitted to play, it is clear that the balance is in Defendants' favor. Since the Halls have shown, at best, only a negligible chance of success, they must demonstrate that the balance of harms is significantly tipped in their favor to prevail on their preliminary injunction petition. The Halls failed to make such a showing. The primary harm to the Halls is that Reggie would have his college basketball career delayed by one season; a real, but non-catastrophic harm.

On the other hand, the NCAA would suffer great harm if the preliminary injunction were granted improvidently because it would have allowed Reggie to make an end-run around the NCAA's well-established and consistently applied initial eligibility requirements. The NCAA's initial eligibility requirements apply only to entering freshmen. Once initial eligibility is achieved, and the student-athlete enters college, he need only maintain a minimum GPA at his college or university. If preliminary injunctions were granted in cases like Reggie's, where it appears that the student athlete simply failed to achieve the minimum academic standards, that nonqualified athlete could escape the initial eligibility requirements by filing a lawsuit and a preliminary injunction motion. In many cases, by the time the litigation is settled, the sports season could well be over. Thus, win or lose, the student athlete would essentially obtain his entire requested remedy. In such circumstances preliminary injunction motions should be carefully scrutinized. Thus, granting the preliminary injunction would harm the NCAA by infringing on its ability to enforce its academic standards.

### D. Public Interest

The public and non-party interests in the outcome of this matter weigh in favor of denying the injunction. First, strict and definite enforcement of the NCAA's initial eligibility requirements protects vulnerable high school athletes. In the highly competitive world of high school basketball, the high school player faces subtle, and sometimes overt, pressure to sacrifice studies in favor of more court time. However, if student athletes, and their high school teachers, counselors, and coaches, know that college athletic participation depends on adequate scholastic achievement, fewer student athletes will miss out on attaining a decent high school education.

The other college student athletes who played by the rules and achieved the core GPA required for eligibility would lose out if the injunction were granted. Certainly, the last person cut from the Bradley basketball team in order to ensure a spot for Reggie has no hope of an injunction to allow him onto the team because his basketball skills were just slightly under Bradley's minimum

requirements. By fostering amateurism and competition within a framework of rules which include academic standards, the NCAA's eligibility requirements provide student athletes with a college experience which goes beyond merely being on a "farm team for the pros". If the concept of a "student athlete" is not to be an oxymoron, the NCAA's initial eligibility requirements must be more than an afterthought or an administrative inconvenience for students, teachers, coaches, and counselors.

### CONCLUSION

While it is clear that Reggie is an above average athlete, it is equally evident that he was a below average high school student. Thus, if anyone dropped the ball here, it was Reggie himself (by not doing better academically) [35] and the staff at St. Mel.

Accordingly, Plaintiffs' application for preliminary injunction is **DENIED**.

---

**35.** The Court notes, in this regard, that Reggie's grades improved dramatically during his last semester, when the time clock was winding down, and it was clear that he had to do so in order to attempt to qualify under the NCAA's regulations. Thus, it is evident that he had the capacity to earn better marks.